POPE AND JACOBS v. STATE, 36 Miss. R., 121.

### LARCENY.

It is not every improper or illegal act of the officer in charge of a jury in their retirement, or of the jurors themselves, that will justify setting aside their verdict. To justify such a result, the act or misconduct must be such as is calculated to exert an improper influence on the verdict.

Where improper influence may have been exerted upon the jury, the presumption of law is against the purity of their verdict; but if it be shown that such influence failed of effect, the verdict will not be set aside.

A juror's testimony to impeach or sustain his verdict, is not admissible on hearing a motion for a new trial.

Error to Oktibbeha circuit court. WILLIAM L. HARRIS, J.

*Henry Dickinson,* for plantiff in error,
Argued the case orally.

*C. J. Sullivan,* on same side,
Cited, The Commonwealth v. Roby, 12 Pick., 496; Taylor
v. Manly, 6 S. & M., 305; 9 ib., 115; Organ v. The State,
4 Cush., 78.

*S. M. Meek,* on same side.

There are only two points requiring the consideration of the
court:

1st. The improper influence exercised by the bailiff, one of
the officers of the court, over the minds of the jury, while he
had them in charge. It was denied by the state, below, and
doubtless will be denied by the state in this court, that what
was said by the bailiff did amount to such improper influence,
or meddling or tampering with the jury, as should set aside
the verdict. Let us see what was his action towards the jury,
and what his language was, upon which this branch of the
motion is founded.

It is beyond question established, by the evidence of the
bailiff himself, as well as by the jurors, who were permitted by
the court to testify, that he did tell the jury, "That unless they
decided the case, 'one way or the other, they should have
nothing more to eat, and no water to drink." But the bailiff
was not only understood to say this, but some of the jury thought
he said that the judge said so. True, all of them say that
they regarded it as a joke, and that it had no influence upon
their verdict. No doubt they thought so. But, under any
circumstances, this would be said to a jury. One or more of
them might be influenced, and seeing the unpleasant attitude
that he would be placed in, should he confess it, would of course
deny that he had been influenced by the remark. True they
are all presumed to be *probi et legales homines,* yet they are
fallible, they are weak men, and may be operated upon by
undue influences, and if so, they would be very loth to con-
fess it.

But we respectfully submit it to the court, whether a man,
a juror, one perfectly honest and disposed to do his whole duty,

both to the state and to the prisoners, might not be unduly influenced, and yet he himself be unconscious of the influence exerted? The human mind is so "strangely and wonderfully made," may there not be exerted upon its secret springs an unseen, and perhaps an unfelt influence, which would powerfully direct it to this or to that conclusion, and, at the same time, its possessor be totally unconscious of the controlling power? This principle, though it may not be universally held by lawyers, is recognized by intellectual philosophers. It is what they term "unconscious influence." But upon this point we are not entirely without legal authority. In the case of Hix v. Drury, 5 Pick., 302, the court says: "So, where a paper which is capable of influencing the jury on the side of the prevailing party, goes to the jury by accident, and is read by them, the verdict will be set aside, although the jury may think that they are not influenced by such paper; for it is impossible for them to say what effect it may have had on their minds." So in the case of McQuillen v. State of Mississippi, 8 S. & M. 596, Chief Justice Sharkey uses the following language: "Or if prejudices existed against him in the community, as is sometimes the case, there was danger that it might be communicated to the minds of these jurors, without their being aware of the motive or effect." At this day, when it is customary to allow jurors food and drink, they would take it as a peculiar hardship, if they were to be denied the necessary food and drink which would keep them comfortable during the determination of a cause; and a weak-minded man, one wanting in resoluteness of purpose, might be induced, through fear of this punishment, to go over to the majority or minority, as the case might be, and thus decide against his better judgment. He would regard it as tyranny, and might endanger the safety and liberty of the prisoners, to save himself from the penalty.

It will be perceived from the record, that the jury had been considering their verdict a whole night (Thursday), and until 3 o'clock P. M. on the next day (Friday). The cause was taken up on Wednesday afternoon, and the examination of witnesses and arguments of counsel continued until Thursday night. On Friday, at noon, they had not determined upon a

verdict. It was then that the bailiff made the remarks attributed to him; and, in a short time afterwards, they made up and returned their verdict into court. The circumstances all go to show that the remarks of the bailiff must have exercised an influence prejudicial to the rights and interests of the prisoners.

But let us examine this subject in the light of authority.

It is well settled that it is not necessary to show that the minds of the jury, or of any member of it, were influenced. It is sufficient to show that intermeddling did take place, to set aside the verdict. Too much strictness cannot be exercised in guarding trials by jury from improper influence. It has been said that "this strictness is necessary to give confidence to parties in the result of their causes; and every one ought to know that for any, even the least, intermeddling with jurors, a verdict will always be set aside." Knight v. Freeport, 13 Mass., 220.

This is the language of the supreme court of Massachusetts in a civil cause. How much more important is it to guard the purity of jury trials against improper influence when the matter at stake is the life or liberty of a prisoner.

The authorities upon this point all agree; and, as they are very numerous, we will only cite, for the attention of the court, a few of the most important.

In the case of Com. v. McCaul, 1 Virginia Cases, 271, it is said (in referring to the separation of the jury), "Although there might be, and properly was, no tampering with any juryman in this case, yet, in a free country, in deciding a particular cause, the decision must be, according to general principles, as applied to that case; and more good will arise for persevering in the sacred principles involved in that case, than will from granting a new trial, although in this individual instance, a verdict has probably been given by twelve men in fact unbiased by the separation."

In this case a majority of the court were of the opinion that actual tampering with the jury was not necessary to be shown, to set aside the verdict; it is sufficient if the opportunity be offered. A new trial was granted, although the court assumed

that the minds of the jury were entirely unbiased. They decide the great principle that the door to abuse must not be opened; that the court will not inquire into the circumstances of a particular case. It is enough if they are satisfied of the possibility of abuse.

The case of Com. v. Roby is, perhaps, the most important case outside of our own state. In this case the court enter into the questions presented with much clearness and ability, and examine many opinions bearing upon them. They say that "when the jury have had communications not authorized, then, inasmuch as there can be certainty that the verdict has not been improperly influenced, the proper mode of correction or relief is by undoing what is thus improperly, and may have been corruptly done."

But this court have adjudicated this very question, and referred to the authorities above cited, especially the last one. The rule which has been established by this court is, "that if the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which, under a more guarded administration, is capable of producing. It is not necessary that any attempt should be made to bias the minds of the jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed; this is the only security; for if it be left open, it may be predicted, with certainty, that evil consequences will fall somewhere. * * * * If the purity of the verdict might have been affected, it must be set aside: if it could not have been affected, it will be sustained. A verdict upon which doubts might rest cannot be good. It must command entire confidence." Hare v. State, 4 Howard, 192.

In this opinion Chief Justice Sharkey, who delivered the opinion of the court, adopts the language of Chief Justice Shaw in the case of Com. v. Roby, above referred to.

In the case of McQuillen v. State, 8 S. & M., 596, Chief Justice Sharkey delivered the opinion of the court, and said, "It is immaterial whether improper influences have been exerted or

not; the only safety is in keeping the jury free from any liability to such influences."

In the case of Lewis v. State, 9 S. & M., 121, the court says: "The trial by jury should be preserved free from all extraneous or improper influences. Confidence in the administration of justice can only be preserved by removing even the shadow of suspicion from those in whose hands it is intrusted."

In the case of Boles v. State, 13 S. & M., 402, Sharkey, Chief Justice, delivered the opinion of the court, and said: "But it has been argued that the verdict should stand, unless tampering or improper influence be shown. This would be a very unsafe rule. The prisoner, who is in confinement, would not be able, one time in a hundred, to show that a verdict had been procured by improper means, although such may have been the case."

In the case of McCann v. State, 9 S. & M., 469, the court says, quoting the language of the judge in Lord Delamere's case, "An officer is sworn to keep the jury, without permitting them to separate, or any one to converse with them; for no man knows what may happen; although the law requires that honest men should be returned upon juries, and, without a known objection, they are presumed to be *probi et legales homines*, yet they are weak men, and perhaps may be wrought upon by undue applications. The evil to be guarded against is improper influence; and when an exposure to such an influence is shown, and it is not shown that it failed of effect, then the presumption is against the purity of the verdict."

In the case of Nelms v. State, 13 S. & M., 508, Chief Justice Sharkey delivered the opinion of the court, and said: "The purity of the trial by jury must be strictly guarded. The verdict, when rendered, should command entire confidence; whatever may detract from that confidence must weaken the security which is felt in the community in this mode of trial. The officer is required by the nature of his duty, as well as by his oath, not to speak to the jury himself on the subject of their deliberations, or to permit others to do so. This ceremony is a mockery if a violation has no other effect than to subject the officer to punishment. If he may speak to them himself, he may permit others to do so, and the door is thus thrown open to tam-

pering, and the safety of trial by jury is invaded to an alarming extent. The duty of the officer is prescribed for the safety of the accused. If improper influences have been employed, it is a poor boon to say to him that the officer is liable. The officer may be willing to incur the punishment for the sake of gratifying his wishes, or for reward. One who thus violates his duty and his oath, should be subjected to the severest penalties; but that does not purify the verdict; it should be set aside."

This court, in a recently decided case, lays down and adheres to the rule established in Hare's case. They say, "If the verdict was rendered under circumstances in which its purity might have been affected, it must be set aside; if it could not have been affected, it will be sustained." Ned and Taylor v. State, 33 Miss., 364.

Now, to make an application of these principles to the case before us, can it be said that the purity of the verdict could not have been affected? Can it be said that there was no improper influence? that the verdict was rendered under circumstances which caused it to command entire confidence? Can it be said that there is no probability that it might have been affected by the language of the officer? Here the bailiff, a sworn officer of the law—sworn, too, in the presence of the jury, not to converse with them himself, or to suffer any one else to do so, "unless by order of the court, after they have retired from the bar" (Rev. Code of Miss., 604, art. 156), enters the jury-room, and tells the jury that, "unless they decide that case one way or the other, they shall have nothing more to eat and no more water to drink!" Some of the jurors testify that they thought that the bailiff said that the judge said so. One of the jurors also interrogated him, and inquired if the judge did say so? and even then he did not deny it. Of course, it must have been supposed that it came from the court; for no jury would suppose for a moment that any one else but the judge would attempt to enforce such measures upon them. Still less would they suppose that an officer who was discharging his duty, under the solemnity of an oath, would attempt to trifle with them, while deliberating upon an important cause, because, forsooth, he had become very weary in waiting upon them. They thought that

the remark had no influence upon their verdict. Just here it must be remembered that there were only eight jurors present out of twelve, and who testified upon the motion. Four were absent. Who will say that it did not influence the absent four?

But it is not necessary for the plaintiffs in error to show that the jury were influenced. It is sufficient if they might have been.

In the case of the Com. v. McCall, 1 Virginia Cases, 271, the court makes use of the following wise remarks: "From the mode in which collusion and tampering is generally carried on, such circumstance is generally known to no person except the one tampering and the person tampered with, or the persons between whom a conversation may be held which might influence a verdict. If you question either of those persons on the subject, he must criminate or declare himself innocent, and you lay before him inducement not to give correct testimony." If the accused were compelled to show the influence and its extent, their rights and interests might be constantly imperiled, of which they might be inwardly conscious, and yet possess no adequate remedy. It is sufficient, as stated by the court, in Hare's case, if the verdict might have been affected. The duty of the officer is prescribed for the protection of the accused; and if they show a gross violation of that duty, the presumption of law is, that they have been injured thereby. The case before us comes fully within the rule, and is, indeed, a much stronger case than either Hare's case or Nelm's case.

If such tampering, and intermeddling, and joking with a jury as this be allowed, anything may. If an officer who is sworn not to speak to the jury, is allowed to converse fully with them about their verdict, and that, too, with an authority which seemed to come directly from the court, surely any one else might be allowed the same privilege. If it were right, and proper, and lawful, for an officer who is sworn not to converse with the jury, unless by the permission of the court, to do so, certainly the door had as well be thrown open, and admit any one who may desire to enter. Verdicts have been set aside by this court, as in McCann's case, 13 S. & M., 471, because an unsworn officer had charge of the jury during a portion of their

retirement, although no undue influence was shown. It is as great a violation of the law for a sworn officer to converse with the jury as it is for an unsworn officer to have them in charge. Better, in fact, that an unsworn officer should thus have them in charge, than for a sworn officer to talk to them at will. The injury is as great in the one case as in the other, and either departure from the rule should avoid the verdict. The mere ceremony of swearing the officer is useless and idle, and should be abrogated, if he is allowed to violate it at his pleasure. This verdict is not above suspicion, and does not and can not command entire confidence and respect.

For this first branch of the motion, the verdict ought to be set aside, and a new trial granted.

2d. As to the jury having spirituous liquors in the jury-room during the progress of the trial.

It appears from the testimony that one of the jurymen, being sick, sent the bailiff after liquor, " to take as medicine." This "medicine," though in a black bottle (a very large dose, one would suppose), was doubtless taken in broken doses; it was not prescribed by a physician, nor was it given to the juror by the consent or through the knowledge of the court. The bottle of liquor was handed in by the bailiff. He did not see any of the jurors drink save Mr. Owen (the sick man), but he could not say that any one else did drink. This is substantially the testimony of the bailiff.

It was impossible for the accused to discover to what extent these " doses " of " medicine " were taken, or what were the effects produced. They might have been taken by all the jury, and some of them might have been under the influence of the intoxicating dose. A man who drinks at all, is liable to drink too much, particularly when cribbed and confined to a jury-room day and night. The prisoners were unable to ascertain the extent of the drinking, inasmuch as it has been settled by this court, and very properly and wisely too, that no juror shall be allowed to testify to his own wrong, to " impeach his verdict." But will it be contended that a prisoner's life or liberty shall be endangered; that the inalienable right which the Constitution gives him, to be tried by twelve good and lawful men,

shall be wrested from him, because of his inability to show that the verdict is corrupt, when he shows, from the natural tendency of things, that it might have been corrupted? They show that the means of corruption were in the reach of the jury—sent for by one of their members. This seems to us to be sufficient. From the nature of things, they could not show more. If spirituous liquors were allowed to circulate in a jury-room; if jurors, through real (as in this case it was) or pretended sickness, are allowed to send a bailiff and get liquor in any quantity, without the knowledge or consent of the court, we can see no reason why they may not be allowed to introduce anything they please into a jury-room. In our opinion, it ought not to be allowed. The trial by jury is justly regarded by the wisest and best of men as the great palladium of civil liberty, and its purity, even as to the forms intended to protect it inviolate, should be scrupulously guarded against every possible encroachment.

We will refer the court to a few adjudicated cases upon this point, which seem to us sufficient to settle this matter. In the case of The People v. Douglass, 4 Cowen, 26, the court holds the following language: "Drinking should not be tolerated in any shape in a jury, during the progress of the trial; and we have uniformly held that it vitiated the verdict in a civil cause, even where the liquor was given to the jury by consent. It may not do to weigh and examine the quantity which may have been taken by the jury, nor the effect produced. In this case it is not at all probable that either of these jurors was the least under the influence of strong drink; but being doubtful whether they may not have drunk something, we ought not, especially in a case of life and death, to sustain the verdict." In this case the court deliver their opinions *seriatim.* Mr. Justice Sutherland says: "There is no difference among us that the mere fact of drinking spirituous liquors is enough to set aside the verdict. It will never do to hold a rule short of this: that when any one of the jury, in the course of the trial, drinks spirituous liquor, we will set aside the verdict on this ground alone. * * * * * Where there is the slightest suspicion of abuse, their verdict should be set aside." *Vide* also Rose v. Smith, 4 Cowen, 19.

In the case of Brant v. Fowler, 7 Cow., 562, the court says,

"We cannot allow jurors thus of their own head to drink spirituous liquors while engaged in the course of a cause. We are satisfied that here there has been no mischief; but the rule is absolute, and does not meddle with consequences. Nor should exceptions be multiplied."

In this case the juror made affidavit that he took the brandy to check a diarrhœa, yet it was held that the verdict should be set aside. This, too, was a civil cause; and we may again ask, if it be important to guard the trial by a jury with so much strictness and vigilance in a civil cause, how much more important is it to enforce the rule in a criminal cause? But it may be said that this last case has been overruled in the same court, at a subsequent sitting, under the administration of different judges. 1 Hill, 207. True, it was to some extent. But it seems to be upon the ground that it was admitted that no mischief was done. In the case before us nothing is admitted; the prisoners waive no right. From their position—being in the custody of the officers of the law, and excluded from any opportunity to search out the facts—they were utterly unable to show to what extent the drinking was carried, or whether it operated injuriously upon the final result or not. All they were able to do was to show that an unauthorized act had been done by the jury, that the means of corruption had crept into their midst, and that the verdict might have been tainted with corruption. This they have shown. Can any one say that they have not suffered by the misconduct complained of?

In the case of Kellogg v. Reed & Wilder, 15 Johns., 455, both parties were allowed by the justice to treat the jury to a bottle of whiskey, "to enable them to listen to the remarks of counsel;" and although the court reverse the judgment on a different ground, still they say that it was gross misconduct in the justice to permit the use of spirituous liquors at the trial, to which the consent of parties affords no excuse."

In the case of Gregg v. McDaniel, 4 Harring., 367, the verdict was set aside for the introduction of intoxicating liquor into the jury-room. Not having the reports before us (only the syllabus), we do not know the character of the case or the extent of the drinking. But it appears that the verdict was set

aside simply for the introduction of the liquor into the jury-room.

Anciently it was the rule to swear the officer who had the jury in charge to "keep them without meat, drink, fire, or candle." This rule in modern times has been greatly modified and relaxed; but certainly it will not be contended that because this modification has taken place, that the bailiff in charge will be permitted to introduce into the jury-room, at his pleasure, or at the pleasure of any member of the jury, whatever species of refreshment may be desired. The rule was relaxed in order to secure to all parties interested in the result of a cause a fair and impartial trial, without compelling the jury, or any member of it, to suffer for those refreshments absolutely essential to render him comfortable. It was thought that a proper relaxation would inure to the benefit of all parties, and add to the security of jury trials. But then it was never intended that it should be allowed save through the knowledge and by the consent of the court. The court, it was thought, would judge of what was right and proper for each individual case. If it is understood that any member of a jury, through the plea of sickness, may introduce into the jury-room, without the knowledge or consent of the court, spirituous liquors, may it not be feared that by such conduct the confidence which is now universally reposed in jury trials will be poisoned? It will not do to say that jurors and officers thus violating their duty render themselves amenable to the severest possible punishment, which should in every case be rigidly inflicted; for, although it may deter offenders from a repetition of the offense should the opportunity again be offered, still it affords no redress to the unfortunate party who may, nevertheless, have been wronged. Suppose, for illustration, that instead of introducing a bottle of liquor into the jury-room, the bailiff had allowed a physician to enter. Would it be contended for a moment that, under such circumstances, the verdict should stand? We think not. And why? Because the opportunity for tampering—the door against corruption, would thus be opened. In this case it would not be necessary for the prisoner to show that tampering had actually taken place. It would be sufficient for them to show that the oppor-

tunity was offered, from which the law would presume that it might have been done. In the case before us, it seems to us that where the prisoners have shown an irregularity has taken place, that an unauthorized act has been done; that the means by which the fountain of justice might have been corrupted was in the midst of the jury; that it is sufficient to set aside the verdict. In the language of Judge Gaston, in a similar case, "The irregularity is confessedly against the law; it impresses on the verdict the stamp of legal suspicion; that impression is not removed; and until it is removed, the law will not found a judgment on what it reprobates and distrusts." We also refer the court to the case of Riggs v. State, 26 Miss., 55.

For either of the grounds suggested in the motion, we think the verdict ought to be set aside and a new trial granted. As it now stands, it does not, and can not, by any possibility, command that confidence and respect which verdicts of a jury should inspire. Such practices, either on the parts of jurors or officers, should never receive the sanction of courts. This mode of trial being justly regarded, when pure and uncontaminated, as the great bulwark against injustice and oppression—as the strongest security to the rights and liberties of the citizen, which human ingenuity and sagacity have ever devised, should be guarded with the strictest vigilance; and "where there is any partiality of the proceedings, inasmuch as there can be no certainty that the verdict has been influenced, the proper mode of correction and relief is by undoing what is thus improperly, and may have been corruptly done, or where the irregularity consists in doing that which may disqualify the jurors for proper deliberations and exercise of their reason and judgment, as where ardent spirits were introduced, then it would be proper to set aside the verdict; because no reliance can be placed on its purity and correctness."

*T. J. Wharton,* for the state, filed an elaborate brief, in which he cited and commented on the following authorities:

1st. On the part of the communication made by the bailiff: Hare's case, 4 How., 187; McQuillen's case, 8 S. & M., 596; Lewis' case, 9 ib., 121; Boles' case, 13 ib., 402; McCann's case,

9 ib., 469; Nelm's case, 13 ib., 508; Ned and Taylor's case, 33 Miss., 370; 6 Serg. & R., 577; 3 Rawle's R., 498.

2d. As to the effect of introducing intoxicating liquors into the jury room: U. S. v. Gilbert, 2 Sumner R., 83; Stone v. State, 4 Humph., 27; Brant v. Fowler, 7 Cow., 562; McLain v. State, 10 Yerger, 241.

SMITH, C. J.:

This was a conviction in the circuit court of Oktibbeha, under an indictment for grand larceny. A motion was made to set aside the verdict, and to grant a new trial, which was overruled, and exceptions taken. The errors alleged to have occurred in the trial relate to this action of the court.

It appears, from the bill of exceptions, that after the jury had retired from the court to deliberate upon their verdict, and before they had agreed, the bailiff, to whose charge they were committed, said to them that "unless they decided the case one way or the other, they should have nothing more to eat, and no water to drink." This communication was made without authority, and was intended as a jest. Some of the jurors so understood it. Others, however, although not so informed, appear to have been under the impression that the bailiff acted by order of the court. This conduct of the officer is assigned as the first ground in support of the motion. And it is insisted that the declaration which he made to the jury, under the circumstances, had, or might have had, an effect upon them prejudicial to the accused.

The conduct of the bailiff was improper and illegal. It was in violation of the express language of the statute, Rev. Code, 504, Art. 156. But the immediate question to be considered is not whether the officer was guilty of a violation of the law, but whether the communication made to the jury was calculated to have an influence upon their deliberations prejudicial to the parties on trial. For it is not now to be controverted, that it is not every improper or illegal act of the officer in charge of the jury, or of the jurors themselves, which will constitute just cause for setting aside the verdict.[1]

[1] The general rule is that the verdict will not be set aside on account of the misconduct or irregularity of a jury, even in a capital case, unless it be such as might affect

Was there an impression upon the minds of the jury which would improperly influence their verdict, the natural or necessary effect of the declaration made to them by the bailiff? If it were not calculated to produce such an effect, there can be no pretense for asserting that for this cause a new trial should be granted.

An officer placed in charge of the jury, under these circumstances, has no authority to furnish them with food or drink of any description whatever. If he should do so without the express command of the court, it would be a palpable violation of his duty. Whether, therefore, in this instance the jury were supplied with refreshments or not, did not depend on the volition of the bailiff. And the supposition is not to be indulged that either the officer or the jury was ignorant of the law. It cannot, therefore, be assumed that the declaration of the bailiff that the jury should have no more food or water unless they decided the case one way or the other, if understood to be made without authority from the court, could have had the least influence upon their deliberations. And it will not be contended that if the bailiff acted by authority, there is just ground for suspecting the purity of the verdict. But admitting, for the purpose of argument, that the jury in fact believed that it depended solely on the will of the bailiff whether they were furnished with refreshments or not, it is not readily perceived in what way the communication of the bailiff could have influenced the verdict either for or against the accused. It might furnish a motive which would accelerate a concurrence of the jury; and, going farther, and admitting that the motive thus presented might be sufficiently potent to overcome their convictions of guilt or innocence of the accused, it is nevertheless manifest that its tendency would not be greater to produce a concurrence as to his guilt than as to his innocence. Indeed, it may be safely assumed, that if such a motive is allowed to have place

their impartiality, or disqualify them for the proper exercise of their functions. Com. v. Roby, 12 Pick., 496, 519; People v. Douglass, 4 Cow., 26; State v. Babcock, 1 Conn., 401; State v. Prescott, 7 N. H., 290; Beebee v. People, 5 Hill, 32; Tooel v. Com., 11 Leigh, 714; Martin v. Com., 17 Leigh, 745; McCarter v. Com., 11 Leigh, 633; Rex v. Woolf, 1 Chitty, 401; Stone v. State, 4 Humph., 27; Whitney v. State, 8 Mo., 165; State v. Fox, 1 Geo. Decis, 35; State v. Peter, ib., 46; State v. Barton, 19 Mo., 227; State v. Igo, 21 Mo., 459.

in the breast of a juror, it would operate generally in favor of the accused, particularly in prosecutions where the death penalty is attached to a conviction.   For we can scarcely imagine a human being so depraved, who, placed in the supposed alternative, would not consent to the escape of a felon more readily than he would agree to become. the judicial murderer of one whom he believed to be innocent.   Anciently, at common law, after the jury were charged, and had left the court to consider of their verdict, they were kept together, without communication with others, and without refreshments of any kind.   These rules are still, with more or less rigor, enforced in several of the states of this confederacy.   In this state they have been greatly relaxed, particularly in regard to the supplying of juries with proper refreshments after they have been charged and placed in the keeping of an officer.   We do not question the policy of the modification which has been introduced.   But it is certain that they have not proceeded from a conviction in the minds of our legislators that in prosecutions for felonies the rule at common law, which excluded the jury, during the hours of its deliberations, from all refreshments, tended to produce improper convictions.   And in view of all the rules which have been adopted for the purpose of insuring impartiality in the verdicts of juries, the suggestion is a novel one that the purity of the verdict is to be suspected if the jury deliberate under the impression that they are not to be furnished with refreshments.   Upon the whole, we are well satisfied that this ground for the motion was untenable.

It appears, further, that, at the suggestion of one of the jurors, who was a physician, the bailiff carried " liquor " in a bottle into the jury-room for another one of the jurors, who was sick.   This was done without the knowledge or permission of the court.   The juror who was sick drank of the " liquor." The bailiff did not see any other person drink, but did not know that no one else drank.   The bottle of liquor was in the room a very short time, during which the bailiff was present, who carried the bottle with him.

Drinking, in any shape, is not to be tolerated in a jury, during the progress of the trial.   The conduct and acts of the

juror, as well as those of the bailiff, were, therefore, highly reprehensible. But the true point of inquiry here is not whether these parties were guilty of improper and illegal conduct, but whether, by such conduct, the verdict was improperly influenced. If, indeed, the evidence closed with the proof of the naked fact that ardent spirits, in quantities sufficient to produce intoxication, were conveyed by the officer into the jury-room, we should feel no hesitation in holding that the conviction should be set aside. Upon such proof there would be ground for suspecting the purity of the verdict. And where facts are established which show that improper influences might have been brought to bear upon the jury, and there is no opposing testimony which negatives the presumption thus created, according to the settled rule of this court the verdict will be deemed vicious. Hart's case, 4 How., 192; McCann's case, 9 S. & M., 469; Organ's case, 26 Miss. R., 78; Ned and Taylor's case, 33 ib., 370. The rule applicable in all cases of this character, and which has been uniformly recognized in this court, is laid down in McCann's case, above quoted, as follows: "The evil to be guarded against is improper influence; and where an exposure to such influence is shown, and it is not shown that it failed of effect, then the presumption is against the purity of the verdict."

The evidence in regard to this point, we think, clearly shows that no effect could in any way influence the verdict resulted from the introduction of the bottle of "liquor" into the jury-room. The officer does not in express terms state that no juror except the sick man drank of the brandy. But as he remained in the room during the whole time the bottle was there, which was a very short time, and did not see any other juror drink, such is the effect of his testimony. Under these circumstances, notwithstanding the irregular and improper conduct of the bailiff and the juror, there is no pretense for asserting that the verdict should be disturbed.

There is another point made upon the introduction of the jurors as witnesses on the trial of the motion for a new trial. It is not to be questioned that their testimony was incompetent. Organ v. State, 26 Miss. R., 83. But as the presiding judge did

not see proper to prevent their examination, and as no exception was taken to the introduction of their testimony, we cannot notice the objection.

Judgment affirmed.

HARRIS, J., gave no opinion, having presided on the trial of the case in the court below.