## FRANK H. RUSSELL *v.* THE STATE.

1. CRIMINAL LAW. *Instructions. Repetitions.*
   It is not error for the court, in a capital case, to refuse to give instructions asked by the accused, which announce a principle contained in other instructions already given.

2. SAME. *Quashing venire.    Order directing new venire.    Practice in Supreme Court.    Waiver.*
   On motion of the defendant the special *venire* summoned in a capital case was quashed, on the ground that the jury-box from which it was drawn had not been legally prepared; and thereupon the court, as provided by § 2759, Code 1871, ordered a special *venire facias*, declaring and adjudging in the order that there was no legal jury-box in the county. *Held*, that in the absence of the facts on which this judgment was based, this court must presume they were sufficient. *Held, further*, that the defendant, who had just succeeded in quashing the first *venire* on this ground, could not be heard to question it.

3. SAME. *Juror opposed to capital punishment.    Rejection by court.*
   In empanelling the jury in a capital case, a proposed juror, upon an examination by the court upon his *voire dire* touching his competency, said he was opposed to capital punishment and had conscientious scruples against its infliction. *Held,* that it was not error for the court, of its own motion, to reject the proposed juror.

4. EVIDENCE. *Conversation. Practice.*

 A witness for the defendant, on examination in chief, detailed part of a conversation between himself and the defendant, in reference to the deceased, which occurred the day before the killing. *Held*, that the evidence was inadmissible on the part of the defendant, and might have been excluded on motion of the State; and that the defendant could not, when the witness was returned to him for re-examination, bring out the balance of the conversation. Had a part of the conversation been brought out by the State, then the defendant might have insisted on the whole of it being detailed.

5. SAME. *Competency. Opinion. Medical witness.*

 A physician of twenty years' standing stated that, although he had several years previously been, for a short time, the defendant's physician, he had not seen him for a considerable period before the killing, and had no knowledge of his condition at that time; that he had never regarded him as insane when he had personal knowledge of him, and did not so regard him at the time of trial. *Held*, not competent to give an opinion as to the defendant's sanity at the date of the homicide.

6. INSANITY. *Expert. Qualifications. Hypothetical questions.*

 A witness stated that, though a practising physician of twenty years' standing, he had never made the subject of mental disease a study, was not an expert in such matters, and was not an expert in "psychological medicine." *Held*, that it was not competent to put to him a hypothetical question, embracing certain facts deposed to by other witnesses and asking his opinion of the defendant's sanity on the basis of said facts.

7. EXPERT. *Insanity. Qualifications.*

 To qualify a witness to testify as an expert upon a question of insanity, in answer to hypothetical interrogatories as to supposed facts of which he has no personal knowledge, he must be, or profess to be, an expert in the general subject of insanity. No acquaintance with cognate pursuits will suffice; and, ordinarily, the general practice of a country physician would not so qualify him.

8. CRIMINAL LAW. *Insanity. Evidence. Condition of accused, before and after homicide, material.*

 In a capital case, on an inquiry as to the sanity or insanity of the accused, it is proper to introduce testimony as to his condition before, at the time of, and after, the killing.

9. EVIDENCE. *Error in excluding, cured.*

 An error in improperly excluding a competent question and answer is cured if the same question be afterwards asked the witness and answered.

10. VERDICT. *Improper influences on jury. Presumption. How rebutted.*

 Where facts are established which show that the jury, in a capital case, were exposed to improper influences, which might have pro-

duced the verdict, and there is no opposing testimony which negatives the presumption thus created, the verdict will be deemed vicious. But where the presumption is negatived by evidence, the verdict will not be disturbed.

11. SAME.  *Intoxicating liquor given to jurors.*

While the introduction of intoxicating liquors as a beverage into the jury-room is highly censurable and should be the subject of exemplary punishment, it will not vitiate the verdict if it can be affirmatively shown not to have injuriously affected the deliberations of the jury.

12. JURY.  *Intoxicating liquor.   Case in judgment.*

On the trial of a capital case, which lasted five days, the bailiff, at the request of certain of the jury who were sick from eating tainted beef, carried into the jury-room, without the knowledge of the court, a pint and a half of whiskey cocktail on the second night, and a pint and a half of raw whiskey next morning, of both which the jurors drank. This was before the testimony for the defence began. It was not shown that any of the jurors were made drunk; but, on the contrary, their conduct during the whole trial was marked by great dignity, decorum and propriety. *Held,* that the verdict was not affected by the liquor, and was valid.

ERROR to the Circuit Court of Yazoo County.

Hon. W. B. CUNNINGHAM, Judge.

This was an indictment against Frank H. Russell, for the murder of Charles E. Fawn, to which the accused pleaded " not guilty," and a special *venire* was drawn. On motion of the defendant this special *venire* was quashed, for the reason, stated in the motion, that the special *venire* was not drawn from a legal jury-box. The order sustaining this motion, after reciting that there were facts proved which constituted the box illegal, and reciting that there was no legal jury-box in the county, as required by § 2759, Code 1871, proceeded, after quashing the special *venire*, as follows : " And thereupon it is ordered by the court that the clerk of the court issue a writ of special *venire facias*, directing the sheriff of said county to summon seventy-five qualified jurors of the county," &c. It appears from the record that the defendant signified his objection to the second special *venire facias* at the time. But he took no bill of exceptions embracing the evidence on which the court acted in making the order.

During the trial of the case a special bill of exceptions was

taken, which recites " that, in empanelling the jury in said cause, one W. J. Farish, he being one of the jurors summoned by the sheriff to serve as a special juror in said cause, upon an examination by the court upon his *voire dire* touching his competency, said that he was opposed to capital punishment, and had conscientious scruples against the infliction of capital punishment; and the court decided said W. J. Farish to be incompetent as a juror in said cause: to which ruling of the court the defendant objected;" and on his objection being overruled, excepted. Then the jury was empanelled and sworn. W. H. Hayman testified for the State that about nine o'clock on the morning of the 26th October, 1875, he saw the defendant Russell walk in the front-door of the court house, in Yazoo City, and walk up opposite the door, and nearly under the door-way leading into the sheriff's office, and he then saw Russell and Charles E. Fawn walking away from the door of the sheriff's office, down the main hall of the court house, when Russell turned half around, and with both hands drew a pistol, aimed at Fawn's head, and fired, shooting Fawn directly through the head. Fawn fell, and in ten or fifteen minutes died in the hall of the court house. Fawn was in his shirt-sleeves, and unarmed. There was no angry language used by either Fawn or Russell, and neither seemed excited. Russell disappeared as soon as he fired.

John Lusk, for the State, who was in the sheriff's office at the time, corroborated Hayman's testimony, and, in addition, stated that when Russell came to the door of the sheriff's office, he said, " Mr. Fawn, let me see you a moment, if you please ;" when Fawn walked to the door, took Russell by the arm, and they together walked off down the hall, apparently entirely friendly.

Robert Lewis, for the State, corroborated the previous testimony, and also stated that as Russell was leaving the court house after the act the witness fired a pistol at him, when he immediately screened himself behind the building from the view of witness.

W. C. Craig, for the State, testified that the following letter, which had been received by Fawn, through the post office, the day before his death, was in the handwriting of Russell : —

"Mr. C. E. FAWN,— If you value your life, keep out of that sheriff's office.

"FRIEND.

"YAZOO CITY, Miss., Oct. 25, 1875."

That Russell was his book-keeper, and he knew it to be his handwriting, although it was evidently disguised.

Four other witnesses also identified the handwriting of the letter as Russell's, and the State rested.

The defence then proved by six witnesses that the accused was, and had been from childhood, subject to epileptic fits; that some of his family had been insane; and that for a day or two preceding the killing of Fawn he acted so strangely as to seriously alarm his wife.

The defendant then introduced J. T. Russell, who testified that he was the father of accused; that he had been deputy under Morgan, the former sheriff, and that Morgan had appointed Fawn a deputy under him; that Fawn earnestly desired witness to remain in the office when he took charge, but witness, though friendly to Fawn, had declined. Witness stated a part of a conversation between himself and his son at the breakfast-table on Sunday before the killing, which occurred Tuesday, and that his son had said "He did not believe the people would allow Fawn to go into the office and collect the taxes." Witness replied he thought differently, judging from the names of the sureties on Fawn's bond, which he had seen. On cross-examination, the witness stated it was true he told John Link that Fawn was a G—d d—d rascal, was dishonest, and he would not have any thing to do with the office while Fawn was in it. On re-examination, the defendant asked the witness to state the entire conversation between witness and accused at the breakfast-table on the Sunday before the killing, and to state why accused did not want witness to go into the office under Fawn; and the defendant offered to show all the conversation, to which the State objected. The objection was sustained by the court, and the defendant excepted.

The defendant then, by several witnesses, proved the insanity of different members of the family of accused, and the various

forms which the mental disease took in each case. One had a peculiar antipathy to negroes, and on one occasion actually made violent demonstrations against one small negro. Another imagined she was going to travel, and packed up her trunk by way of preparation for the imagined journey.

Dr. R. L. Dunn, for the defendant, testified that he was a graduate of a medical college, and had practised medicine for twenty years; that he had once treated the accused as a physician, two or three years before the killing of Fawn; that the disease of accused was one of excessive nervous irritability, and indicated that he was subject to epileptic attacks; that he had not been the physician of the defendant for two or three years previous, and had not seen or noticed him for some considerable time before the killing, and had no personal knowledge of his then condition. The witness was then asked whether he knew the defendant well, to which he answered, Yes. He was then asked if, in his opinion, the accused was sane or insane at the time that Fawn was killed. This question was objected to by the State, the objection was sustained, and the defendant excepted. The witness further testified that he had not made the science of mental disease a special study, and was not an expert in psychological medicine. A hypothetical question was then proposed to be put to the witness, Dr. Dunn, touching the prisoner's sanity or insanity on a case to be assumed; but the question was not put in form or framed, the State objecting to the putting of a hypothetical case, because it was not shown that Dr. Dunn was an expert in psychological medicine, and had not made the subject of mental disease a special study; and it was admitted that he was not an expert in that sense, though a practising physician. The court sustained the objection, and the defendant excepted. On cross-examination, Dr. Dunn testified that during his acquaintance with the prisoner, as well while attending him as his physician as afterwards, he had never regarded him as insane.

W. Y. Gadberry, for the defendant, testified that he was a graduate of medicine, and had been a regular practitioner for thirty-one years; that he had particularly studied this case; that he visited the prisoner in jail after the killing;

and the witness described at great length the condition of the prisoner at that time.

The defendant's counsel asked the witness if the unsoundness of mind in the accused at the time he saw him in the jail, a few hours after the killing, was such as to render him incapable of judging right from wrong? To this question the State objected; the objection was sustained, and the defendant excepted.

When he saw the prisoner in jail, the witness was of the opinion that he was suffering from *delirium ebriosum;* but, from subsequent study and reflection, had now changed that opinion. He now believed him to have then been insane. On cross-examination, the witness stated that he believed the accused insane when he visited him in jail, — went there with that idea; and he made his examination of the accused in jail with this preconceived view in his mind. His expression was idiotic. Did not think he could have distinguished right from wrong.

Dr. J. D. Burch, another medical gentleman, explained at great length the nature, causes and effects of epilepsy, and its tendency to produce insanity. The defendant then rested.

The State, in rebuttal, introduced several witnesses who testified that the conduct of the accused on the morning of the killing was cool and deliberate, and there was nothing peculiar in his manner or appearance. Among them, Mr. Stanhope Posey, who succeeded Russell as book-keeper of R. Craig & Sons, testified that, in the course of his duties, he went over all the work done by Russell, and found it all exact and correct down to the morning of the killing inclusive, the accused having worked on the books and made some entries that morning; that the house was an extensive one, kept a large set of books, and that their business required a skilful and expert book-keeper.

Several physicians also testified that, from examination of the accused just after the killing, he was not insane.

This was all the evidence.

The instructions sufficiently appear in the opinion of the court.

The jury returned a verdict of guilty, and adjudged the penalty to be imprisonment for life.

The defendant moved for a new trial, on the ground (among others) of misconduct of the jurors in said cause during the trial thereof; in support of which motion the following evidence was introduced: —

Jack Lander testified that he was bailiff in charge of the jury; that on Tuesday night, the day the jury was empanelled, and after a large portion of the State's evidence had been introduced, he passed into the jury-room a pint and a half of prepared whiskey cocktail in a bottle, and some of the jurors drank of it; that on Wednesday morning, before the court opened, he passed into the jury-room another bottle, containing a pint and a half of raw whiskey; that, about eleven o'clock of the same day, O. H. Broomfield, one of the jurors, was taken sick, looked very pale, and that the court, in consequence, adjourned two hours earlier than usual. On cross-examination, he stated that the jurors complained that their food — bad beef — made them sick, and complained of their bowels; that Broomfield vomited in the court-room, apparently pieces of half-cooked beef; that the jurors were all farmers; that he saw none of the jury intoxicated; that they behaved with great decorum, dignity and propriety during the whole trial; that Broomfield was sick, not drunk; that they did not drink all the whiskey; that the trial lasted until Saturday night; that they had no whiskey except that mentioned, and none while hearing the testimony for the defendant or deliberating on their verdict; that witness got the whiskey and cocktail, and also some paregoric to relieve the jurors from their sufferings.

George W. Parks, for the defendant, was sitting near Broomfield in the court-room, saw him vomit, and thought he smelt whiskey in the vomit.

The State then introduced W. H. Foote, who said he was sitting near the juror Broomfield, saw him vomit, and did not detect any whiskey smell. John Broomfield, brother of the juror, swore the juror Broomfield was a temperate man, not addicted to drink, but from boyhood had been subject to attacks of indigestion, causing vomiting. Dr. P. J. McCormick testified that he sat within ten feet of Broomfield, the juror,

noticed him particularly, a nd gave his opinion, as a physician, that he was not drunk, but sick, when he vomited.

This was all the evidence on the point.

Whereupon the court overruled the motion for a new trial. The defendant excepted, and by writ of error brought the case to this court, where he assigns for error : —

1. The action of the lower court in giving and refusing instructions as to the burden of proof on the issue of insanity.

2. Ordering the new special *venire*.

3. Rejecting the juror Farish.

4. Refusing to allow J. T. Russell to state the rest of the conversation with accused.

5. Refusing to allow Dr. Dunn to give his opinion of the sanity of accused at the time of the killing.

6. Refusing to let Dr. Dunn answer the hypothetical question as to the prisoner's sanity.

7. Refusing to let Dr. Gadberry testify as to his opinion of the prisoner's sanity a few hours after the killing.

8. Overruling the motion for a new trial.

*R. Bowman* and *C. V. Gwin*, for the plaintiff in error, argued the case orally with great ability, and filed an elaborate brief, making the following points : —

1. The court had no right to go further than to quash the first special *venire*. The next one should have been drawn from the box. *Non constat*, but the rest of the names in the box were legal. The new *venire* was void. Code 1871, § 2759; 1 Chitty Criminal Law, 523.

2. It was an error to reject the juror Farish because of his scruples against capital punishment. The accused had a right to have him on the jury. Acts 1872, p. 88, § 5.

3. The burden of proof was not on the defendant to prove insanity. Wharton on Homicide, § 666 ; *McNaughten's Case*, 10 C. & F. 200; *Stokes's Case*, 3 C. & K. 185; *Pomeroy's Case*, Appendix to 2d ed. of Wharton on Homicide, 753; *McCann's Case*, 16 N. Y. 58; *Pike's Case*, 49 N. H. 399; *Jones's Case*, 50 N. H. 369; *Bartlett's Case*, 43 N. H. 224; *Haskin's Case*, 3 Gray, 463; *McKie's Case*, 1 Gray, 61; *Eddy's Case*, 7 Gray, 583; *Ogleton's Case*, 28 Ala. 692;

*Rogers's Case*, 7 Met. 500 ; *York's Case*, 9 Met. 93 ; *United States* v. *McClare*, 17 Law Reporter, 439.

4. It was manifest error to refuse to allow the witness J. T. Russell to state the entire conversation between himself and the plaintiff in error concerning Fawn after a part of it had been introduced.

5. The court also erred in refusing to allow the witness Dr. Dunn to testify as to the sanity or insanity of accused. *Baxter* v. *Abbott*, 7 Gray, 72.

6. It was also error to refuse to allow the defendant to put a hypothetical case to the same witness. *People* v. *Lake*, 2 Kernan, 358 ; *McAllister* v. *State*, 17 Ala. 434 ; *In re Vananken*, 2 Stock. 186 ; *Rogers's Case*, 7 Met. 500.

7. A professional man who, like Dr. Gadberry, has examined the accused a few hours after the killing, may be asked whether the accused, who he had stated was insane, was incapable of distinguishing right from wrong. *Clark* v. *State*, 12 Ohio, 483 ; *Bovard* v. *State*, 1 Morris's State Cases, 818, note.

8. The verdict is vitiated by the improper communication with the jury, and giving them the liquor. *Taylor* v. *Manley*, 6 S. & M. 306 ; *People* v. *Douglass*, 4 Cowen, 35 ; *Brant* v. *Fowler*, 7 Cowen, 562 ; *Hare* v. *State*, 4 How. (Miss.) 192 ; *Knight* v. *Freeport*, 13 Mass. 218 ; *Perkins* v. *Knight*, 2 N. H. 474 ; *Pope* v. *State*, 36 Miss. 136 ; Graham & Waterman on New Trials, 102.

*G. E. Harris*, Attorney-General, for the State.

1. It was not error, after quashing the special *venire*, to order the sheriff to summon a jury from the body of the county. See Code 1871, § 2759, and also §§ 736, 737.

2. It was not error to set aside the juror Farish, who said he had conscientious scruples against capital punishment. The Act of 1872, p. 88, on this subject, was repealed by the Act of 1875, p. 79; and now such persons are disqualified. See *Lewis* v. *State*, 9 S. & M. 118.

3. It was not error to sustain the objection to proving a conversation between witness and accused : a portion of it was brought out by the accused, and when he attempted to bring out the balance the State objected, and might have done so at any time.

4. It was improper to ask Dr. Dunn for an opinion after he had said he was not an expert in such matters, or to ask him a hypothetical question upon insanity after he had stated that he had never made the disease of the mind a study.

5. The instructions for the State are well sustained by authority. See *Green* v. *State*, 28 Miss. 687; *Gipson's Case*, 38 Miss. 297; *Bovard's Case*, 30 Miss. 600; *Newcomb's Case*, 37 Miss. 405, 406; *Pike* v. *State*, 49 N. H. 399; *Jones* v. *State*, 50 N. H. 369; *Com.* v. *Rogers*, 7 Met. 502; 2 Greenl. Evid. § 373; 13 S. & M. 202.

It will be seen, by reference to the instruction given for the accused on the subject of insanity and the burden of proof, that it goes fully as far in his favor as the rules of law will permit, if not farther, and that he has no reason for complaint.

6. The last point to be noticed, of which there is very serious complaint, and which presents some difficulty, is the misconduct of the jury on the trial of the case.

It is true that the jury and the bailiff were guilty of misconduct which is reprehensible; and, while the evidence shows that whiskey was introduced into the jury-room, for which the officer should have been severely punished, yet I cannot think, when we take the whole of the testimony together, that the verdict of the jury was affected injuriously, or improperly influenced, or procured by means of it.

Where facts are established which show that the jury on the trial of a felony were exposed to improper influences which might have produced the verdict, the presumption of law is against the purity of the verdict. But it will not be set aside if it appears by opposing evidence that they failed to have any effect upon the jury. See *Pope* v. *State*, 36 Miss. 121; *McCann* v. *State*, 9 S. & M. 465; *Caleb* v. *State*, 39 Miss. 721.

CHALMERS, J., delivered the opinion of the court.

The principal question discussed at the bar was the one much mooted of late in the American courts, as to what is the proper rule with reference to the burden of proof in criminal cases where the defence relied upon is insanity.

The defendant offered and the court refused to grant three

instructions, to the effect that the burden of proving the sanity of the accused is devolved by law upon the State, and that if the jury entertain a reasonable doubt of his sanity arising from the whole testimony in the case, they must acquit.

The refusal to grant these instructions, it is urged, was such error as must cause a reversal. It appears, however, upon an examination of the record, that the court below did not refuse these instructions because of the principles of law announced by them, but because those principles had already been announced in other instructions which had been granted.

Thus, by the ninth instruction granted for the defendant, the jury are informed that they must acquit, " unless they believe from the evidence, and beyond every reasonable doubt arising from the evidence in the case, that the defendant was at the time of the homicide of sound memory and discretion to such an extent as to enable him to know the nature and quality of his act; and the burden of proof is upon the State to establish by satisfactory proof the guilt of the defendant, unless the evidence otherwise appears in the cause."

Again, in the twelfth instruction for the defendant, the jury are informed that they must be satisfied of the prisoner's sanity beyond every other reasonable hypothesis.

By the fifteenth instruction they are told that they must acquit, if the insanity of the prisoner is established by a preponderance of the testimony in the case.

We know of no theory of the law governing this class of defences which goes farther than these charges. If the State cannot complain of them, certainly the defendant cannot.

The defendant moved to quash the special *venire* summoned in the case, on the ground that the jury-box from which it was drawn had not been legally prepared. The motion was sustained; and thereupon the court ordered the sheriff to summon a special *venire*, as provided for by § 2759 of the Code, in cases where there is no jury-box. To this the defendant excepted. The court in its order declared and adjudged that there was no legal jury-box in the county. The facts upon which this judgment was based are not before us, and we must presume that they were sufficient. At all events, the defendant, who had

just succeeded in quashing the first _venire_ on this ground, cannot be heard to question it.

It is objected that the court of its own motion rejected a member of the _venire_, who stated that he had conscientious scruples against capital punishment. This was unquestionably correct, as decided in _Lewis_ v. _State_, 9 S. & M. 115, 118, and other cases. The act of 1872, p. 88, which rendered such persons competent jurors, was repealed by the act of March 4, 1875.

J. T. Russell, the father of and one of the witnesses for the defendant, detailed a portion of a conversation between himself and the defendant in reference to the deceased, which occurred the day before the killing. This was brought out by the defendant on the examination in chief; and when the witness was returned to him to be re-examined, he sought to bring out the balance of the conversation. This was objected to by the State, and the objection was properly sustained. The whole conversation was inadmissible in evidence on the part of the defendant. If a portion of it had been brought out by the State, the defence might have insisted upon the whole of it being detailed; but having been brought out by the defence, the prosecution might object at any time to any more of it being detailed, or might have excluded the whole.

Dr. R. L. Dunn, a physician of twenty years' standing, was asked whether in his opinion the defendant was insane at the time of the killing. The objection made by the State was properly sustained. The witness had previously stated that although he had several years before been for a short time the defendant's physician, he had not seen him for a considerable period before the killing, and had no knowledge of his condition at the time. He also stated that he had never regarded him as insane when he had personal knowledge of him, and did not so regard him at the time of the killing.

Manifestly he was not competent to give an opinion as to his sanity at the date of the homicide.

It was then proposed to put to Dr. Dunn a hypothetical question, embracing, as we suppose (though the question is not set out in the record), certain facts which had been de-

posed to by other witnesses, and to ask him as to his opinion of the defendant's sanity, on the basis of said facts. To this also objection was sustained by the court, and, we think, rightly. The witness had previously stated that, though a practising physician of twenty years' standing, he had never made the subject of mental disease a study, was not an expert in such matters, and was not an expert in "psychological medicine."

The asking of hypothetical questions upon a presumed state of facts, for the purpose of eliciting the opinion of a witness, can be justified only upon the theory that the witness is so familiar with the general characteristics of the subject under discussion as to be able to form opinions worthy of consideration, even though wholly ignorant of the particular transaction in controversy. Such testimony at best is of an exceedingly unsatisfactory character, and is often as much calculated to mislead as to guide to a correct conclusion. It is only in the exact sciences — and certainly medicine is not one of these — that their professors are able to say with any certainty that a given cause must produce a given effect, or that a particular result must have proceeded from a specific cause. Inasmuch, however, as in all pursuits and occupations there are some facts and principles which may be regarded as indisputable, the law permits persons who are experts in their several callings to express their opinions upon subjects with which their studies and occupations have made them familiar, even though they have no acquaintance with the particular transaction under investigation. But it is essential that the witness should be, or profess to be, an expert in the general subject under discussion. No acquaintance with cognate pursuits will suffice, unless the matter inquired about is common to both professions.

The witness in the case at bar expressly disclaims being an expert in mental diseases, and said that he had not made such diseases the subject of special study. His twenty years of medical practice had probably been confined to the treatment of the ordinary diseases falling within the range of a country practitioner. Such an experience would not ordinarily qualify

him to testify as an expert upon a question of insanity, upon hypothetical interrogations as to supposed facts of which he had no personal knowledge.

Chief Justice Shaw, in discussing the admissibility of these hypothetical questions in cases of insanity, says : " It is upon this ground that the opinion of witnesses who have long been conversant with insanity in its various forms, and who have had the care and superintendence of insane persons, are received as competent evidence, even though they have not had opportunity to examine the particular patient, and observe the symptoms and indications of disease at the time of its supposed existence. . . . But the opinion of a medical man of small experience, or of one who has crude and visionary notions, or who has some favorite theory to support, is entitled to very little consideration." *Commonwealth* v. *Rogers*, 7 Met. 500, 505.

Dr. Gadberry, another physician, was not allowed to state his opinion as to the sanity of the prisoner at the time when he saw him, a few hours after the killing.   On an inquiry as to the sanity or insanity of a party, it is proper to introduce testimony as to his condition before, at the time of, and after the killing.   *Grant* v. *Thompson*, 4 Conn. 203 ; *Dickinson* v. *Barber*, 9 Mass. 225.   It appears, however, that the witness, at a subsequent period of his examination, was permitted to state that in his opinion the prisoner was insane at the time when he visited him in the jail, a few hours after the killing.

We will remark, in taking leave of the points arising on the plea of insanity, that an attentive perusal of the testimony fully satisfies us of the correctness of the finding of the jury on this subject.   Apart from the fact that the prisoner had been some years before, and also in early childhood, subject to attacks of epilepsy, there is nothing to support the idea that he was insane, save the unprovoked and cold-blooded murder of which he was guilty ; and this, we fear, proceeded only from the madness of passion, or from a wretchedly inadequate conception of the sanctity of human life.

Misconduct on the part of the jury was made the ground of

a motion for a new trial in the court below, and is urged as ground of reversal here.

It appears that, during the progress of the cause, a number of the jury were made sick, by being fed upon tainted beef; their bowels being much affected thereby, the bailiff attending them, at their request, without the knowledge of the court, carried to them, at night, a pint and a half of whiskey, made into the beverage known as "cocktail," of which a number of them drank. The next morning he again carried to them a pint and a half of raw whiskey, a portion of which was consumed, and the balance removed from the room. During the same morning, and several hours after the whiskey had been drunk, one of the jurors became sick, while sitting in the jury-box, and vomited. The court took a recess, in consequence of his sickness, earlier than usual. An attempt was made to show that this juror was drunk on this occasion, but the attempt, we think, was a failure.

We have had some difficulty in determining what disposition to make of this assignment of error. There is scarcely any thing in legal procedure which is watched with such vigilance and jealousy as the verdict of a jury in criminal cases. It has been well said that it must not only be free from all improper influences, but from all suspicion thereof; and that when it has been shown that there was a possibility of its having been procured or influenced by improper means, it will impose upon the party seeking to uphold it the burden of establishing affirmatively that it was not so influenced or produced.

No cause can be more baneful to the purity of a verdict than the use of intoxicating drinks by the jury while engaged in their deliberations. Nothing can be more revolting to a sense of justice or of decency than the idea of the life or liberty of a citizen depending upon the maudlin deliberations of drunken jurors. The parties in a civil suit, and *a fortiori* the defendant in a criminal prosecution, have the right to demand that the case shall be tried, not only by jurors who are not drunk, but by men whose minds are not even influenced or clouded by liquor. Intoxicating liquors as a beverage, therefore, should

be rigidly and carefully excluded from the jury-room; and if absolutely necessary for medical purposes, should be administered only in small portions upon the prescription of a physician and under the sanction of the judge. But while the introduction of such liquors in any other manner is highly censurable and should be the subject of exemplary punishment, it will not vitiate the verdict, if it can be affirmatively shown not to have injuriously affected the deliberations of the jury. The true rule on the subject is thus stated by Judge Smith, in *Pope* v. *State*, 36 Miss. 121, 136. Speaking of the introduction of liquor into the jury-room, he says: " The true point of inquiry here is not whether these parties were guilty of improper and illegal conduct, but whether by such conduct the verdict was improperly influenced." . . . " Where facts are established which show that improper influences might have been brought to bear upon the jury, and there is no opposing testimony which negatives the presumption thus created, according to the settled rule of this court, the verdict will be deemed vicious." He then reviews the facts proved in the case under discussion, and arrives at the conclusion that the presumption has been negatived, declaring that, " notwithstanding the irregular and improper conduct of the bailiff and juror, there is no pretence for asserting that the verdict should be disturbed."

Let us test the case at bar by this rule. The trial lasted five days. The liquor was given to the jury on the night of the second and early in the morning of the third day. The State had not then closed its testimony in chief, nor the defendant commenced his. The quantity of liquor was small, and only a portion of the second supply was drunk. Several of the jury are proved to have been affected by the spoilt beef, and it is stated that a number of them partook of the liquor. The quantity was therefore presumably insufficient to have seriously affected the minds of any of them. In addition, it was received at night and early in the morning, some hours before they were called upon in court to listen to testimony, and two days before they retired to consider of their verdict. Lastly, it is proved that " their conduct during the whole trial was

marked by great dignity, decorum and propriety." Under these circumstances, we think it may be fairly said that it has been affirmatively shown that the verdict was not affected by the liquor.

In conclusion, we cannot forbear remarking that if the judge of the court below failed to punish the bailiff who furnished these jurors with liquor, he failed to discharge his duty. After the repeated decisions on this subject, it is certainly time that both jurors and officers were informed as to the law in this respect; and if they will learn it in no other manner, it is the duty of the circuit judges to teach them by fines and imprisonment.                    *Let the judgment be affirmed.*