## LEWIS *v.* THE STATE, 9 Smedes & Marshall, 115.

### HOMICIDE.

Although the rule was formerly different, the court now possesses the power to excuse a juror, when he states voluntarily, without being asked, "that he had conscientious scruples against capital punishment." The rule is, that the court may set aside incompetent jurors, at any time before evidence is given.

Two considerations unite in the admission of dying declarations: The necessity of the case, and the situation of the declarant. The danger of impending death is an equivalent to the sanction of an oath. And the same rules apply, in these cases, to slaves as to white persons.

The presumption of law is in favor of the proper religious culture in slaves, and their belief in revelation and a future state of rewards and punishments; and unless the contrary is shown the declarant will be presumed to have had such belief.

It must be established as a previous fact, before dying declarations can be admitted, that the declarant was sensible of his approaching dissolution.

The fact that the deceased, after the wound was inflicted, cried, "Oh my people!" does not indicate the apprehension of approaching death.

It is the belief of the declarant that his wound is mortal, and of his future accountability, that renders the declarations admissible.

The conduct of a juror, in conversing, writing, and receiving notes from a third person not of the jury, during the progress of the argument of the prisoner's counsel, even when his affidavit is read in excuse, is very reprehensible, and improper.

[1] Wharton Am. Cr. Law, 1457; ib., 631-2-3-4-5; ib., 639, 647-8-9, 712, and cases cited.

Error to Warren circuit court. COALTER, J.

The plaintiff in error was indicted in the court below for the murder of David, a slave, and being tried was found guilty.

During the empanelling of the jury, William A. Haynes, one of the *venire*, summoned in the case, was called and sworn, and tendered by the court to the district attorney, who, being satisfied with the juror, turned him over to the prisoner, who accepted. The said Haynes, of his own motion, told the court he had conscientious scruples against capital punishment. The defendant insisted on accepting him as a juror in the case, but the court refused to have Haynes sworn, and dismissed him, and the defendant excepted.

On the trial, Lawrence Clarke, a witness for the state, and master of the deceased slave, David, testified that on the night of the 8th day of July, 1846, in the county of Warren, about ten o'clock, he was aroused from his sleep by a cry of distress, and hurrying about half a mile he found his slave, the deceased, injured badly; that the deceased said, "Oh my people," seemed like he wanted to see his people, but said nothing to indicate his apprehension of immediate death.

Daniel McGill, a witness for the state, testified that he was a practicing physician; that he was called to see the deceased slave on the night of the 8th of July, 1846, and saw him on the morning of the 9th. The slave was then dead. He examined the body, and found a ragged cut on the right jaw of the deceased; the bone was not hurt; several small shallow stabs and cuts were on his shoulders and back, and one stab, the fatal wound, was inflicted on the left side, between the eighth and ninth ribs, which reached the spine and divided the aorta. That such a wound must necessarily have caused death; it might produce it in a few minutes, and life might endure for an hour or two. Upon this preliminary proof, the district attorney offered to prove by Lawrence Clarke, what the deceased said about the injury he had received. The defendant objected to dying declarations being introduced on the showing made; the court overruled the objection, and permitted Clarke to go on and prove the declarations of the deceased; and the defendant excepted.

On the hearing of a motion for a new trial, the counsel read

the affidavits of S. B. Wall, R. H. Smith, and R. H. Tompkins, which stated in substance, that pending the trial of the cause, and while the counsel for the defendant was addressing the jury, one of the jury, Henry Strong, was engaged for a very considerable length of time, first in a conversation, and then in a written correspondence with a person not of the jury, receiving from him and apparently reading several notes. The district attorney then offered to read the affidavit of Henry Strong, which was in substance, that the correspondence referred to in the affidavits filed by the defendant did take place between himself and Harper R. Hunt, while the counsel for the defendant was addressing the jury; but that correspondence did not relate to the case under trial, but was in relation to a matter of private business between himself and Hunt. The prisoner by his counsel objected to the reading of this affidavit, but the court overruled the objection and allowed it to be read.

The court overruled the motion for a new trial, and the prisoner excepted, filed his bill of exceptions, and brings the case to this court by writ of error.

CLAYTON, J.:

Several errors are alleged to have occurred upon the trial of this cause, to the prejudice of the prisoner.

The first related to the rejection of William A. Haynes as a juror. This person, after having stated that he had formed and expressed no opinion in the case, was tendered to the prisoner as a juror, when he voluntarily stated to the court that he had conscientious scruples about finding any man guilty of murder, and could not conscientiously take the oath. The court thereupon discharged him, without challenge, either upon the part of the state or of the accused. This is claimed to be error.

It is admitted by the counsel of the prisoner, that this would have been good cause of challenge on the part of the state if taken before the juror was tendered to the prisoner. Although the rule was formerly different, we think, at this day, there can be no doubt the court possessed the power which it exercised on this occasion. It was the duty of the court to see that an impartial jury was empanelled and that it was composed of men

above all exception. When the proposed juror stated his objections, it was right to respect them, and to procure another who was not restrained by such feelings from the discharge of his duty and the administration of the law. Otherwise, an undue advantage would be afforded the prisoner. In the People v. Damon, 13 Wend., 354, the rule is said to be, that the court may set aside incompetent jurors at any time before evidence is given.[1]    See Fletcher v. State, 6 Humphreys, 249.

The next objection is to the admission of the dying declarations of the deceased. It may be well to observe in the first place, " that by statute, all the laws in force for the trial of a free white person for a capital offense, are declared to be in force for the trial of slaves for offenses declared capital by the laws of this state." Several reasons are urged for the exclusion of this testimony. The first is, that by the provisions of our statute, every slave who gives testimony in a court must first be charged before he is examined as to the consequences attached by law to his giving false testimony; that this is in addition to the oath; and as dying declarations are admitted, because the law presumes the situation of the party imposes as solemn an obligation to speak the truth as an oath, they stand only in place of the oath. Where another sanction is added, they cannot supply the place of that sanction. This reasoning has failed to convince us. Two considerations unite in the admission of such evidence. First, the necessity of the case, and next, the situation of the declarant. The danger of impending death is regarded as equivalent to the sanction of an oath. The same necessity which justifies dispensing with the oath, will also justify dispensing with the charge directed to be given by the statute.

It is also objected, that there ought, in the case of slaves to be some evidence of a sense of religious accountability, upon which the validity of all testimony rests; and that the same presumption of such religious belief cannot be indulged in reference to them, as in regard to white persons. As to the latter, it is said, the presumption is in favor of their proper religious culture, and belief in revelation and a future state of rewards and punishments; as to slaves, it is contended, the presumption does

[1] See Wharton Am. Cr. Law, 3020, and cases.

not arise, because of a defect of religious education. It is true, that if the declarant had no sense of future responsibility, his declarations would not be admissible. But the absence of such belief must be shown. The simple elementary truths of Christianity, the immortality of the soul, and a future accountability, are generally received and believed by this portion of our population. From the pulpit many, perhaps all, who attain maturity, hear these doctrines announced and enforced, and embrace them as articles of faith. We are not inclined to adopt the distinction.

It is lastly insisted that the preliminary showing of the declarant's knowledge of his situation, of his sense of impending death, was not sufficient to justify the admission of his declarations. The law is, that to authorize their introduction, it must be established as a previous fact, that the declarant was sensible that he was on the verge of dissolution.[1] This rule was stated explicitly in the case of McDaniel v. The State, 8 S. & M., 401.

In this case the preliminary proof was, that the deceased, when first discovered, after the wound was inflicted, exclaimed, " O my people ;" but said nothing else, which indicated the apprehension of immediate death. This showing was not sufficient. It indicated alarm and suffering, but showed no sense of approaching dissolution. It is the belief of the declarant that his wound is mortal, and that his account with time is to be speedily closed, that renders the declaration admissible. It matters not how this belief is manifested, whether by words or conduct, or by an accurate perception of his true situation ; yet its existence must be shown in some way. This kind of evidence forms an exception to the general rule ; it is only admissible under peculiar circumstances ; and, unless satisfied that they exist, it is our duty to exclude it. 1 Greenl. Ev., 192, *et seq.*

For this reason, a new trial will have to be granted. But if, on the next trial, stronger evidence on this point should be produced, such as to satisfy the circuit judge that the declarant was

[1] King v. Commonwealth, 1 Va. Cases, 78 ; Woodsides v. State, 2 How., 655 ; Campbell v. State, 11 Ga., 353 ; Nelson v. State, 9 Humph., 9 ; Hill v. Commonwealth, 2 Gratt., 594 ; Roscoe Cr. Ev., 30 ; 1 Phill. Ev., 289, 292 ; Peake's Ev., 15 ; 1 Greenl. Ev., 156, *et seq. ;* Rex v. Van Butchell, 3 C. & P. 629 ; Rex v. Wilborne. 1 East. P. C., 358 ; 1 Leach, C. C., 503, n.

sensible of his true situation, and that his end was at hand, then the declarations will be admitted, otherwise not.

Another objection is taken, growing out of the misconduct of one of the jurors. He was engaged in conversing, and in writing and receiving and reading notes from a third person, not of the jury, during the progress of the argument of the prisoner's counsel to the jury. His affidavit was permitted to be read, to show that the correspondence and conversation were about a wholly different matter, and did not touch the subject of trial.

This conduct was highly reprehensible, and should have subjected the juror to punishment. Whether it would avail of itself to set aside the verdict, need not be determined. Yet the trial by jury should be preserved free from all extraneous and improper influences. Confidence in the administration of justice can only be preserved by removing even the shadow of suspicion from those in whose hands it is entrusted. See Hare v. The State, 4 How., 193.

The judgment is reversed and new trial granted.