# WHEELING.

## STATE OF WEST VIRGINIA *v.* GREER.

Submitted June 22, 1883—Decided October 27, 1883.

1. It is the right of the prisoner in a criminal case to be tried in the county, where the alleged offence was committed; a right, which the State cannot take from him. (p. 805.)

2. But on the prisoner's petition, and for good cause shown, he may have the venue changed to some other county. (p. 805.)

3. The burden is on the prisoner to show to the satisfaction of the court, good cause to have the trial of the case removed; and such cause must exist at the time the application is made. (p. 805.)

4. Where a prisoner indicted for murder showed, that the sheriff of the county was against him and wrote a letter calculated to prejudice him, which was published in a newspaper printed and circulated in the prisoner's county, and great excitement was shown to exist, and ten months after the homicide threats of lynching him were made by a mob, the most of whom lived in

or near the county-seat, where he would have to be tried. HELD :

Good cause was shown for a change of venue.   (p. 808.)

5. In empanelling a jury in a capital case a proposed juror examined on his *voir dire*, who in answer to a question propounded by the court says, he has conscientious scruples against inflicting the death-penalty, is incompetent and is properly rejected by the court, although he says he will be governed by the law and the evidence.   (p. 809.)

6. Since our statute gives a jury a discretion, when they find a prisoner guilty of murder in the first degree, to say he shall be punished by imprisonment in the penitentiary, it is more important to the State, that juries should have no conscientious scruples against inflicting the death penalty.   (p. 809.)

7. Proceeding in a trial in the absence of the prisoner in a felony case is fatal to the verdict.   It is absolutely necessary, that the prisoner shall be present in court, when anything is done in his case in any way affecting his interest.   (p. 811.) .

8. Where in a murder-trial the State proceeded to cross-examine a witness during the absence of the prisoner, the verdict will be set aside, although the court, when the prisoner was present, instructed the jury to disregard the evidence, and the State proceeded to ask the same questions of the witness and received the same answers.   (p. 810.)

9. An instruction calculated to mislead the jury should be refused. (p. 813.)

10. It is manifestly improper to instruct the jury as to the weight of the evidence.   (p. 813.)

   *Quære :* Will a verdict be set aside, because the attorney for the State in a felony case contrary to the statute comments on the fact, that the prisoner was not examined as a witness in his own behalf?

11. An instruction should not be given, that refers to the facts, upon which it is predicated, as "under the circumstances shown in evidence."   It leaves the jury to ascertain what the circumstances are, and they may understand the circumstances in such a way as that the law propounded in the instruction would not be applicable.   (p. 815.)

12. The 10th and 11th points in the syllabus in *Cain's Case*, 20 W. Va. 679, re-asserted.   (p. 816.)

13. An instruction must be relevant to the evidence in the case; if it is not and is calculated to mislead the jury, it is error to give it. (p. 816.)

14. An instruction is correct, which informs the jury that the prisoner cannot shield himself under the plea of self-defence, if he had reason to believe and did believe, that the assaulting party only intended to commit a trespass, and did not intend to take life or inflict great bodily harm. (p. 817.)

15. The right of self-defence may be exercised in behalf of a brother or a stranger. (p. 818.)

16. What one may do in behalf of himself, when threatened with death or great bodily harm, he may do in behalf of a brother; but if the brother was in fault in provoking an assault, that brother must retreat as far as he safely can, before his brother would be justified, in taking the life of his assailant in defence of the brother. (p. 819.)

17. But if the brother was so drunk, as not to be mentally able to know his duty to retreat, or was physically unable to retreat, a brother is not bound to stand by and see him killed or suffer great bodily harm, because he does not under such circumstances retreat. (p. 819.)

18. The 14th point of the syllabus in *Cain's Case*, 20 W. Va. 679, re-asserted. (p. 819.)

19. Upon a trial for murder the use of a deadly weapon being proved, and the prisoner relying on self-defence to excuse him for the use of the weapon, the burden of showing such excuse is on the prisoner, and to avail him, such defence must be proven by a preponderance of the evidence. (p. 820.)

20. A new trial will not be granted in a criminal case for matter that is a principal cause of challenge to a juror, which existed before he was elected and sworn as such juror, but which was unknown to the prisoner, until after the verdict, and which could not have been discovered by the exercise of ordinary diligence, unless it appears from the whole case that the prisoner suffered injustice from the fact that such juror served upon the case. (p. 820.)

21. The plain meaning of the words, *"unless it appears from the whole case, that the prisoner suffered injustice from the fact that the juror served upon the case"* is *"unless it appears from the whole case as shown by the evidence submitted to the court (and not from the evidence before the jury) that the prisoner suffered injustice from the fact that the juror served upon the case."* In such case the trial-court upon a motion for a new trial upon such ground should look into the affidavits and other evidence to sustain the motion and also the evidence to defeat it, and from that determine whether the juror, who had before the trial expressed his opinion as to the guilt of the accused, had expressed such opinion from a partial knowledge of the case, but

that his mind was really unbiased, so that he could impartially try the accused upon the charge, or whether he had prejudged the case and was determined to find him guilty without regard to the evidence. And if from such evidence it should appear, that a juror had prejudged the case, the court would assume, that the prisoner had suffered injustice by reason of such juror trying his case ; and it would be the duty of the court under such circumstances to set aside the verdict and grant a new trial ; and if the motion were overruled, the Appellate Court on writ of error would reverse the judgment, set aside the verdict and grant a new trial for such case. (p. 820.)

22. The secret drinking of intoxicating liquor by the jury, while in their room deliberating upon a murder-case, is gross misbehavior, and raises the presumption, that the prisoner was injured thereby, and the burden is on the State in such a case to show beyond a reasonable doubt that the prisoner was not injured by such misconduct    (p. 826.)

23. Where the deputy sheriff having the jury in charge admits, that liquor in sufficient quantities to make the jury or some of them intoxicated was taken by him to the jury-room on the day the verdict was rendered, the presumption arising therefrom that the prisoner was injured thereby is not rebutted by the affidavit of the guilty deputy, that none of the jury were intoxicated. (p. 826.)

24. Though the jury have no authority to fix the term of imprisonment, yet such fixing of the term by the jury is mere surplusage ; and the verdict of guilty is good, and the imprisonment is the act of the court. (p. 829.)

The opinion contains a statement of the facts of the case.

*John A. Hutchinson, Charles E. Hogg, R. S. Brown* and *C. S. Brown* for plaintiff in error.

*Attorney-General Watts* for the State.

JOHNSON, PRESIDENT:

On the 2d day of March, 1882, James A. Greer was indicted in the circuit court of Jackson county for the murder of Robert G. Maguire on the 19th of January, 1882. On the 6th day of November, 1882, a jury was empaneled to try the case on the issue found; and on the 18th day of the same month the jury rendered the following verdict: " We the jury find the prisoner, James A. Greer, not guilty of murder in the first degree, but we the jury do find the priso-

ner, James A. Greer, guilty of murder in the second degree and ascertain and fix the term of his imprisonment in the penitentiary of this State at ten years." Thereupon the prisoner moved the court to set aside the verdict, because it was contrary to the law and evidence, and for other reasons, which motion being argued by counsel and considered by the court was overruled; and the prisoner having nothing further to urge against judgment being entered, the court entered the following judgment: "And the court proceeding to ascertain and fix the term of said prisoner's confinement in the penitentiary of this State, the court doth ascertain and fix such term of confinement of said prisoner in said penitentiary at ten years. It is therefore considered by the court, that the said James A. Greer be imprisoned in the penitentiary of this State for the term of ten years, the period by the court ascertained and fixed as aforesaid, and also the period by the jury in their verdict ascertained. It is ordered, that the sheriff of this county do upon the rising of this court, or as soon thereafter as may be, remove and safely convey the said James A. Greer from the jail of this county to the said penitentiary of this State, therein to be kept and imprisoned and treated in the manner directed by law for the period aforesaid."

On the trial the prisoner saved twelve several bills of exceptions to rulings of the court; and to the said judgment he obtained a writ of error.

From the evidence, which is certified, it appears, that on the 19th day of January, 1882, John M. Greer was drunk, and on the street in Ripley, the county seat of said Jackson county, called the deceased a "damned cowardly scoundrel and a thief;" that deceased was some distance away, but said he would stand his abuse no longer, and went towards him, some of the witnesses say, with an open knife in his hand; while others say, that he had no knife in his hand, and that when he came near said John M. Greer, the prisoner, who is a brother of said John M. Greer, and who was sober, said to the deceased, "Bobby, stop; we are sober and John is drunk;" that deceased replied: "That is all right, but I do not intend to take his slang;" that deceased attempted to pass around prisoner toward John M. Greer, when prisoner

struck him in the neck with a pocket-knife; his brother, Dr. Maguire, caught deceased, and with the help of others took him away; the only words he spoke after being struck were, "I am gone, ain't I?" that he died from loss of blood in about twenty minutes after he had received the blow from the knife; that prisoner raved after striking the blow, using such expression as, "I have killed him, I have killed him for John M. Greer, I will be hung for it; but I will kill any man who interferes with John when he is drunk." I do not pretend to give all the evidence. It was contended on behalf of the State, that the killing was willful, deliberate and premeditated, and on behalf of the prisoner, that the killing was done solely in defence of prisoner's brother, John M. Greer.

We will take up the bills of exceptions in their order. The first is to the overruling of prisoner's motion for a change of venue. The Constitution of our State guarantees every man a right to be tried at his home, in his county, where the alleged offence was committed. Many men had been denied this right, and had been dragged from their homes to be tried by strangers for alleged offences, thus denying to them the influence of a good life upon the men who were to try them. This clause in the bill of rights requiring a man to be tried for an offence in the county, where the offence was committed, was inserted for the protection of the prisoner. But it may be, that for some cause great prejudice may exist in a man's county against him, so that he could not there receive a fair and impartial trial. So the same section of the bill of rights further provides: "Unless upon petition of the accused, and for good cause shown, it is removed to some other county." It cannot be removed on the mere petition of the accused. The State has some rights as well as the accused; the petition for the change of venue must not only be filed by the accused, *but he must show good cause* for such change of venue. The State can under no circumstances remove the case on its own motion, and the prisoner cannot have it done *unless he shows good cause* therefor. The burden is on the prisoner to show the good cause; and the affidavits filed or proof taken before the court may be submitted by the State; and if on the whole case made the court is satisfied,

that good cause has been shown for a change of venue, it is the duty of the court to order the case to be removed for trial to some other county, otherwise to refuse to order such removal.    That counter affidavits and counter proofs may be heard is well settled.    *McCue's Case,* 1 Va. Cas. 137; *Caperton* v. *Bowyer,* 4 W. Va. 176; *Wormley's Case,* 10 Gratt. 658; *Railroad Co.* v. *Applegate,* 21 W. Va. 171.    In *Comm.* v. *Bedinger,* 1 Va. Cas. 125; *Ingersoll* v. *Wilson,* 2 W. Va. 59, and in *Ott* v. *McHenry, Id.* 73, no counter affidavits or proofs were heard.

In *Wormley's Case,* in which the defendant was convicted of murder in the first degree, there was a motion for a change of venue, which was overruled.    The court of appeals held, that upon an application of a prisoner charged with murder for a change of venue his affidavit alone of his fears or belief, that he cannot obtain a fair trial in the county, is not sufficient to sustain the motion; but he should be required to show by independent and disinterested testimony such facts, as make it appear probable, at least, that his fears and belief are well founded.    But where such facts are shown by the prisoner and are not successfully repelled or explained by the commonwealth, no argument of inconvenience or delay should be permitted to stand in the way of the great end to be attained, a fair and impartial trial.    In that case the court of appeals affirmed the judgment of the court below.    The court by Daniel, Judge, said:

"With these views of the law we cannot undertake to say after an examination of the testimony on both sides, that the circuit court improperly exercised its discretion in refusing to grant the prisoner's motion.    It is true it is shown that subscription papers were circulated to raise a fee for the employment of counsel to aid in the prosecution, and that they had been signed by some twenty or thirty persons, such a fact of itself is no ground for a change of venue.    It is a circumstance tending to show the extent, to which an opinion of the prisoner's guilt prevailed; but it is not difficult to conceive how men just and upright and free from any ill-will or feeling of vindictiveness towards the accused, in view of the fact that much of the ability, learning and eloquence of the bar was enlisted in his cause, might be willing to contribute

for the procuring of additional counsel on the side of the
prosecution, in order to bring about, as far as might be, an
equal litigation and its probable result, justice as well to the
commonwealth as to the accused. It is true also, it is
shown that there had been, shortly after the homicide was
committed, considerable excitement against the accused in
the immediate neighborhood, and on several occasions per-
sons had been heard to express the belief that the people
would not.bear with an acquittal; that some who were pres-
ent at the inquest, and others who were present at the ex-
amining court, had expressed the belief, that the people
would have put the accused to death, if the suggestion had
been made by leading men present; and one of the witnesses,
examined on behalf of the application, states that he had
heard a person say, that if the prisoner was acquitted by the
jury, he would not be surprised if he were hung before he
got far from the court-house; that some six or eight other
persons were present on the occasion, who seemed to nod
assent. But on the other hand there is the total absence of
proof of any threats against the prisoner; and it was shown
that the excitement, which at first prevailed, had greatly
abated, and had at first been confined mainly, if not entirely,
to the neighborhood of the residence of the deceased, and of
the place where the homicide was committed, and that the
expressions above mentioned had been uttered mainly by
persons coming from the same neighborhood. And the
opinion is expressed by some of the witnesses, in a manner
and under circumstances entitling it to the fullest confidence,
that if any effort had been made on the public occasions
above mentioned to do violence to the prisoner, or in any
manner to impede the course of the law, such effort would
have been successfully met and opposed by the people there
assembled. And as to the jury the testimony was clear to
show, that the court would probably meet with no serious
difficulty in obtaining one from the remote parts of the county
free from all exceptions.

"In this state of things we do not think the court erred in
refusing to change the venue."

It is true, as claimed by counsel for prisoner, that *the good
cause* for removal, should exist at the time the application

was made. The application was made at the November term, 1882, and evidence taken *pro* and *con.*, and the court overruled the motion for a change of venue. At the November term defendant filed his petition, in which he alleged, that the State, before his original petition was filed, at the August term, had had a large number of printed affidavits circulated among the people and twenty-four of them were signed and sworn to from four to eight days before the original petition was filed. Of this the prisoner complains, insisting that it was to his injury having the case discussed by the people from whom his trial must come. While this course was irregular and perhaps unfair to the prisoner, yet it was not of itself sufficient to grant him a change of venue.

The conduct of the sheriff shortly after the homicide in writing the letter, which he did, with regard to the prisoner was calculated to prejudice him and, we must say, was extremely improper.

What were the circumstances existing at the time of the last application for a change of venue? The affidavits and evidence before the court show, that the sheriff of the county, who would be required to summon the regular juries for the term, and if they should be exhausted to summons talesmen, was unfriendly, to say the least, to the prisoner; that there was not only a spirit of mob-violence toward the prisoner exhibited a short time before the session of the court, nearly ten months after the homicide was committed, but that it had so far materialized, that it was feared by many, that the prisoner would be lynched. It is true that the most of the mob were in and around the scene of the homicide, but that was at the county-seat, the place where the prisoner would have to be tried. While it is true that the witnesses, who testified that they believed the prisoner could have a fair and impartial trial, were more numerous than those who testified to the contrary belief, yet their affidavits in many cases contain no reason for such belief. Taking all the evidence and circumstances surrounding the case, it seems to us, the court erred in overruling the motion to change the venue. If the right secured to the citizen, amounts to anything, we can scarcely conceive of a stronger case for its exercise than the case before us.

The *second* bill of exception was to the ruling of the court sustaining the challenge to W. S. Duff, who was sworn on his *voir dire*, having been regularly drawn as a juror.  The question was propounded by the court "whether he had any conscientious scruples against inflicting the death penalty in a proper case?"  To which, answer was made, that "he had conscientious scruples against inflicting the death penalty; that he would be governed by the law and evidence, but was opposed to inflicting capital punishment."  "Whereupon said proposed juror was rejected by the court for that reason alone and no other, against the objection of the prisoner. "In empaneling a jury in a capital case a proposed juror, who, when examined on his *voir dire*, in answer to a question propounded by the court says he has conscientious scruples against inflicting the death-penalty, is incompetent, and is properly rejected by the court, although he says he will be governed by the law and evidence.   The State has the right as well as the prisoner to have such a case tried by impartial jurors.    *Russell* v. *State*, 13 Miss. 367; *Lewis* v. *State*, 9 S. & M. 115; *Commonwealth* v. *Lesher*, 17 Serg. & R. 155; *People* v. *Damon*, 13 Wend; 351; *Lowenburg* v. *People*, 5 Parker C. R. 414; *O'Brien* v. *People*, 36 N. Y. 276; *State* v. *Howard*, 17 N. H. 171; *State* v. *Ward*, 39 Vt. 226; *Greenley* v. *State*, 60 Ind. 141; *Martin* v. *State*, 16 Ohio 364; *State* v. *Bowman*, 80 N. C. 432; *Williams* v. *State*, 3 Kelly (Ga.) 453; *Williams* v. *State*, 32 Miss. 389; *Burrill* v. *State*, 18 Tex. 713; *U. S.* v. *Wilson*, Baldwin C. C. 78.

In our State by statute, if the jury find the prisoner guilty of murder in the first degree, they may in their discretion say he shall be punished by confinement in the penitentiary; in which case he is by the court sentenced to the penitentiary for life.   Therefore in our State for a stronger reason should a proposed juror be required to stand aside, who on his *voir dire* declared he had conscientious scruples against inflicting the death-penalty.   In those States, where the only punishment for murder in the first degree is death, a juror, although he had conscientious scruples against inflicting the death-penalty, yet might and probably would be constrained by his oath to find the prisoner guilty of murder in the first degree, although he knew the court on such a verdict could render

no other judgment but sentence of death against the prisoner. In our State he might be willing to find him guilty of murder in the first degree, yet refuse to agree to render such a verdict, unless the rest of the jury were willing to add to the verdict, "and that he shall be punished by confinement in the penitentiary," and thus prevent a verdict without being conscious of having violated the oath, which he had taken.

In California in 1852, if not now, grand larceny was at the discretion of the jury punishable with death. In *Tanner's Case*, 2 Cal. 257, in answer to a question as to whether he had any conscientious scruples against the infliction of capital punishment the proposed juror said, that he would hang a man for murder but would not hang him for stealing. The court rejected him; held to be right. Murray, C. J., said: "It was only from his unwillingness to punish the crime with death, that he could be said to be incompetent. The words of the statute are, '*If the offence charged be punishable with death.*' Here was an offence so punishable. How could a juror be said to be competent, who would not affix this punishment? And if the verdict and judgment are consequent one upon the other, how could finding the prisoner guilty and affixing a less punishment cure this incompetency? The law ordained, that this offence shall be punished with death; and to allow jurors to sit upon a trial for larceny, who declared they would not impose this penalty, would defeat the intention of its framers and practically work a repeal of its provisions. It would be a mockery of justice to allow or compel a juror to be sworn and placed upon a jury, when he declared that his conscience was so at war with a law, that he would not under any circumstances consent to the highest punishment provided for a breach of that law; and that his fellow jurors must shape their verdict to his preconceived opinions, he having no discretion in the premises."

This decision we approve. Our statute contains the same provision (Code, ch. 159, § 5.) The court did not err in rejecting the proposed juror.

Bill of exceptions No. 3 shows, that during the trial the counsel of the prisoner asked, that the prisoner might retire, and he did retire in charge of the jailor, and upon prisoner's

request the jailor put prisoner in his cell without the knowledge of the counsel for the State or the counsel for the prisoner; and the jailor returning to his seat in the court-room it was thought by the court and counsel on both sides, that the prisoner was present. The cross-examination of a witness was directed to proceed, and in the absence of the prisoner the cross-examination of the witness proceeded, and the attorney for the State asked the witness two questions, which in the absence of the prisoner were answered. It was then discovered, that the prisoner was absent; and the court immediately stopped the examination of the witness, and instructed the jury to pay no attention to the evidence introduced in the absence of the prisoner, and ruled out the same, and directed the prisoner to be brought into court, and when prisoner returned, the attorney for the State put the same question to the witness and received the same answer. This was one of the grounds upon which the prisoner asked a new trial, which motion was overruled.

Proceeding in a trial in a felony-case in the absence of the prisoner is fatal to the verdict. It has been uniformly held in Virginia and in this State, that it is absolutely necessary to a valid conviction, that the prisoner shall be present in court, when anything is done in his case in any way affecting his interest. *Sperry's Case,* 9 Leigh 623; *Hooker's Case,* 13 Gratt. 763.

In *Jackson's Case,* 19 Gratt. 656, it was held, that upon a trial for felony it is the right of the prisoner, a right which he cannot waive, to be present from the arraignment to the verdict. And if the evidence of a witness on the trial, which has been reduced to writing, or any part of it is read to the jury in the absence of the prisoner, it is error, for which the verdict will be set aside. In that case the court said: "If witnesses are examined he must have an opportunity to hear and know what they say. If notes of the testimony are afterwards read to the jury, it is no less his privilege and right to hear the reading of it. How much influence the reading of the testimony in this case may have had upon the minds of the jury it is impossible to determine. It is not however a question, whether the effect of the reading of the testimony, in his absence, was unfavorable to him or otherwise, or how far his case was affected by it, if at all."

So we say here, that we will not enquire whether the prisoner was unfavorably or otherwise affected by the cross-examination of the witness in his absence. He had the right to be present, which he did not and could not waive. He had the right to observe every look, gesture or movement of the witness, while he was testifying; and it mattered not, that the court excluded the evidence and certified that it was repeated in his presence. It was the duty of the court to observe whether the prisoner was present, and to permit nothing to be done in his absence; and if the court through inattention was not observant of the absence of the prisoner as soon as it was observed, he should have arrested the trial at once, directed a juror to be withdrawn, and commenced the trial again or continued the case. Better the expense of a new trial than that the obvious right of the prisoner should be invaded. If this bulwark of liberty should be broken down by attempting to cure such an error by excluding the evidence received in the absence of the prisoner, and having it repeated in his presence, we know not where we could draw the line, and we should soon be without a rule to guide us. It is suggested by the Attorney-General, that it was the prisoner's fault, by asking to be put in his cell. There is nothing in this suggestion. It was manifestly the duty of the attorney for the State and the court to see to it, that the prisoner was present when the witness was being cross-examined. Our own Court has adhered to the strict rule of the Virginia court of appeals. (*Younge's Case*, 2 W. Va. 579; *Conkle's Case*, 16 W. Va.; *Sutfin's Case*, *supra*.) The court clearly erred in refusing to set aside the verdict because of the absence of the prisoner, while a part of the evidence was being introduced.

The *fourth* bill of exceptions is to the refusal to give the second instruction, as asked by the prisoner, and modifying it, and giving it as modified. The instruction is as follows: "That the rule in self-defence is, that whatever one person may do for himself, he may do for another; and a brother may defend his brother from the unlawful assault of a person, who has threatened him with death or great bodily harm; and in making such defence he is entitled to the same protection under the law as the person whom he was defend-

ing; and that if the jury believe from the evidence that if
the act charged against the prisoner was done in defence of
his brother, John M. Greer, against the alleged unlawful and
threatened danger at the hands of the deceased, then the
jury must acquit the prisoner." The instruction as asked
was clearly not the law. *Cain's Case*, 20 W. Va. 679. Not
a word is said about the reasonable grounds to believe and
the belief on such reasonable grounds that such danger ex-
isted. It would be improper to say as in the modification,
that the jury must believe such danger actually existed. If
the prisoner had reasonable grounds to believe and did be-
lieve, that his brother was in danger of losing his life or suf-
fering great bodily harm, it was sufficient, although the
threatened danger was in fact unreal. *Cain's Case, supra*;
*Jones's Case*, 20 W. Va. 764. The instruction as modified
being the words "and that such danger existed" was calcu-
lated to mislead the jury, and was therefore improperly
given.

Bill of exceptions No. 5, is to the refusal of the court to
give at the instance of the prisoner instructions Nos. 12
and 14.

The twelfth instruction is as follows: "The jury are in-
structed, that the alleged declarations made by the prisoner,
after he struck the blow on the deceased, are to be taken in
connection with the state of excitement and confusion of mind
of the prisoner; if the jury believe he was excited and in a
raving state, as given in evidence, and if such declarations
were made under such circumstances, they are to be as ad-
missions only that he struck the blow, and not a confession
of any particular grade of crime; and the jury are further
instructed, that such declarations are to be considered by
them with great caution, in view of the infirmity of memory
and influences which often affect witnesses, and if they be-
lieve, that any of the witnesses for the State were actuated
by partisan sympathy, prejudice against the prisoner, or bias
in favor of the prosecution, who testified to such declarations,
such declarations ought to have but little weight."

Without attempting to say how much of said instruction
propounds the law correctly, it was sufficient to warrant the
refusal of the court to give it, that it asks the court to instruct

the jury on the weight of the testimony. No instruction is proper that informs the jury as to what weight the evidence should have upon their minds. If the evidence is competent, it is for the jury alone to weigh it. *Wade Thompson's Case,* 21 W. Va.

Instruction No. 14, also refused, is as follows : "No words of reproach or insult used by John M. Greer towards the deceased under the circumstances proven in the case, considering the distance at that time existing and intervening between the said John M. Greer and the deceased, constituted such a fault or provocation on the part of said John M. Greer, as justified the deceased in advancing upon said John M. Greer for the purpose of assulting him, and the said John M. Greer and the prisoner were not under said circumstances bound to retreat before the advance of said deceased ; and if the jury believe from the evidence, that insulting words were spoken of and to the said deceased by said John M. Greer, immediately prior to the homicide, and from all the circumstances in the case the prisoner had reasonable grounds to believe and did believe, that the deceased was about to inflict death or great bodily harm upon the said John M. Green, and that such danger was imminent, then such insulting words were not such fault or provocation, as would preclude the prisoner from defending his brother to the extremity of taking the life of the deceased without retreating, and the jury must acquit."

This is certainly a very strangely constructed instruction. It assumes, that certain insulting words were used by Greer under a certain assumed state of circumstances, while at an assumed distance, without specifying what, or stating it hypothetically, only referring to the whole evidence for it, and then stating, that if from all the circumstances in the case, the prisoner had reasonable grounds to believe and did believe, that his brother was about to be killed or suffer great bodily harm from deceased, that the prisoner could lawfully strike the blow without retreating. Because of the assumptions of fact, and confused character of the instruction, it was properly refused. What is meant by the words "*under the circumstances proven in the case,*" &c.? The court might think certain things were proved, and the jury,

and counsel might take an entirely different view of the proof.

The sixth bill of exceptions was to certain remarks made by one of the attorneys. The bill shows, that the "prisoner was not examined as a witness in his own behalf in the case, and that during the argument one of the counsel for the State said to the jury in his argument "defendant has it in his power to make it as clear as the noon-day sun whether Robert Maguire had a knife in his hand at the time he struck the fatal blow, and he has not done—;" thereupon the prisoner called the attention of the court to said language, and asked the counsel what he meant by such a statement. He said it was by way of argument, and declined to say what he meant, and stated that there was no power in the court, nor anywhere else to make him say what he meant; that he had made the statement and stood by it; and thereupon the defendant excepted to said language and statement and asked the court to certify the same which is accordingly done, &c."

The prisoner moved to have the verdict of the jury set aside because of the said statement, which motion the court overruled. Before the sentence was completed, the attorney was stopped by counsel for defence. It is certainly not clear what the counsel for the State meant, whether he meant that the prisoner could make the matter clear by his own or other evidence. But if he had commented contrary to the statute, on the fact, that the prisoner had not been as he might have been under the statute examined as a witness in his own behalf, whether such comment would have been a sufficient ground to set aside the verdict, we will not now decide, as the question does not arise. The attorney for the State, whose duty it is to conduct the trial for the State, should be extremely careful not to make comments on the fact that the prisoner was not examined as a witness, as it may be that a verdict against the prisoner would have to be set aside for that reason, although the court should direct the jury to disregard such comments.

The seventh bill of exceptions is to the refusal to give prisoner's sixth instruction as asked, and modifying it, and giving it so modified. The instruction is: "If the jury believe from the evidence, that the wound inflicted on the body

of the deceased by the prisoner alleged to be the cause of his death, was given by the prisoner under the circumstances, shown in evidence, by means of an ordinary pocket-knife which the prisoner had been accustomed to carry, then the mere fact that the prisoner did use said pocket-knife in the affray, under said circumstances, cannot justify the inference of malice or premeditation in the commission of the homicide."

The court modified the said instruction by adding the following words: "Unless the jury believes from the evidence, that the prisoner, before the mortal blow was struck, took out and opened said pocket-knife intending to use it."

The instruction even as modified is subject to the same objection as the 14th just considered. The instruction uses the words, "under the circumstances shown in evidence." What were these circumstances? As said before, the court and counsel might think they were of one character, and the jury might believe that they showed a very different state of facts. So the instruction was well calculated to confuse and mislead the jury. The modification of the instruction did not, and could not injure the prisoner, for as modified it was more in his favor under the law than against him. The law as laid down in *Hill's Case*, 2 Gratt., and in *Cain's Case*, 20 W. Va. 681, is: "A man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act, and if the prisoner with a deadly weapon in his possession without any or very slight provocation gives to another a mortal wound, the prisoner is *prima facie* guilty of willful, deliberate and premeditated killing, and the necessity rests upon him of showing extenuating circumstances, and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, he is guilty of murder in the first degree." "Where a homicide is proved the presumption is that it is murder in the second degree. If the State would elevate to murder in the first degree, she must establish the characteristics of that crime; and if the prisoner would reduce it to manslaughter (or justifiable homicide), the burden of proof rests upon him."

In *Jones's Case*, 20 W. Va. 764, we held as follows: "Upon a trial of shooting with intent to kill, the use of a

deadly weapon being proved, and the prisoner relies upon self-defence to excuse him for the use of the weapon, the burden of showing such excuse is on the prisoner, and to avail him he must prove such defence by a preponderance of the evidence." The same principle applies to the defence of a brother, as to the prisoner himself. The instruction as modified violates this principle. Whatever may have been decided as to the inference of malice from the use of a deadly weapon, and on whom is the burden of self-defence in other States, our courts and the court of appeals of Virginia have uniformly held the law to be as above stated. The instruction as modified although not the law did not prejudice the prisoner.

The *eighth* bill of exceptions is to the giving six several instructions to the jury at the instance of the State. The first two instructions given, are in the precise language of the 10th and 11th points of the syllabus in *Cain's Case*, and are here approved. But it is insisted that they are mere abstract propositions of law. In view of the evidence which is all certified, we cannot say that it was improper to give the instruction in this case.

The *third* instruction was intended to apply the principles of the 6th point of the syllabus in *Cain's Case* to this. The instruction is as follows: "If the jury believe from the evidence that there was a quarrel between the deceased and John M. Greer, and both were in fault, and a combat ensued between the deceased and the prisoner, James A. Greer, as the result of such quarrel, and in said combat, the prisoner killed the said deceased, then in order to reduce the offence to killing in self-defence, two things must appear from the evidence and circumstances of the case or both: first, that before the mortal blow was given, the prisoner declined further combat, and that he and said John M. Greer retreated as far as they could with safety to themselves or to either of them; and secondly, that the prisoner killed the deceased through the necessity of preserving his own life, or the life of the said John M. Greer, or to protect himself or said John M. Greer from great bodily harm." If the combat took place, between the prisoner and deceased, as the result of a quarrel between deceased and John M. Greer, why should

103

John M. Greer retreat, before the prisoner, although he had caused the combat and retreated, would be justified in killing in defence of himself? Yet this instruction would have placed the prisoner in this predicament. But an instruction must be relevant to the evidence in the case; and here the evidence is all certified, and there is no pretense that there was any quarrel or combat between the prisoner and the deceased; the whole theory of the defence is that the prisoner killed the deceased in defence of his brother, and not of himself. The instruction was to the prejudice of the prisoner, and the giving thereof is ground for setting aside the verdict.

The fourth instruction is: "The court instructs the jury, that if they believe from the evidence and circumstances in this case as proved, that the said John M. Greer provoked the deceased to make an assault upon him, and that such assault was intended by the deceased to be a mere common trespass upon the person of said John M. Greer, and it so appeared to the prisoner, then the prisoner was not justified in taking the life of the deceased to protect said John M. Greer from such assault or trespass." This instruction propounds the law correctly and was properly given. *Cain's Case, supra.*

Instructions Nos. 5 and 6 are as follows:

"5. If the jury believe from the evidence, that John M. Greer, the brother of the prisoner, was in fault and by his fault brought about the assault by the deceased upon him, said John M. Greer, then said John M. Greer was bound to retreat as far as he could, unless prevented by the fierceness of the attack threatened by the deceased, before James A. Greer, the prisoner, was justifiable in taking the life of said Robert G. Maguire in order to save the life of John M. Greer, or to protect him from great bodily harm."

"6. If the jury believe from the evidence, that John M. Greer, the brother of the prisoner, provoked the deceased to make an assault upon him, the said John M. Greer, then said John M. Greer was bound to retreat, as far as possible, consistent with his own safety at the time, before the prisoner, James A. Greer, was justifiable in killing the deceased to save the life of said John M. Greer, or to protect him, said John M. Greer, from great bodily harm."

The right of self-defence may be exercised in behalf of a brother, or of a stranger. Deitz's Criminal Law, see 126 *a*, and cases cited. What one may lawfully do in defence of himself—when threatened with death or great bodily harm, he may do in behalf of a brother; but if the brother was in fault in provoking an assault, that brother must retreat as far as he safely can, before his brother would be justified in taking the life of his assailant in his defence of the brother. But if the brother was so drunk as not to be mentally able to know his duty to retreat, or was physically unable to retreat, a brother is not bound to stand by and see him killed or suffer great bodily harm, because he does not under such circumstances retreat. It is only the faultless, who are exempt from the necessity of retreating while acting in self-defence. *Cain's Case, supra.* Those in fault must retreat, if able to do so; if from the fierceness of the attack or for other reasons they are unable to retreat, they will be excused by the law for not doing so. As a general legal proposition the 5th and 6th instruction propounded the law correctly; but in view of the evidence in this case, if the defence had asked it, the instruction should have been modified by inserting the following words: "Unless the jury believe from the evidence, that the said John M. Greer was so drunk as to be mentally incapable of knowing that it was his duty to retreat, or physically unable to retreat."

The ninth bill of exceptions is to the refusal of the court to permit depositions, taken at the coroner's inquest, to be taken to the jury-room. This was not error. *Cain's Case, supra.*

The *tenth* bill of exceptions is to the refusal of the court to give prisoner's eighth instruction as asked, and to giving it as modified by the court. The instruction as asked is as follows: "If the jury shall believe from the evidence that the facts proven by the prosecution in this case show that the defendant claimed to do the cutting, which resulted in the death of Robert Maguire, the deceased, and testified to by the witnesses for the prosecution, in self-defence, the burden of proof rests on the prosecution to show beyond reasonable doubt that the cutting was criminal. And if the prosecution shall fail to convince the jury by evidence beyond reasonable

doubt that such cutting was criminal, it will be the duty of the jury to acquit the defendant." The court modified the instruction by inserting the words "at the time it was done" before the words "in self-defence." The court should have rejected the instruction without modification, as it is not law. The modification made it no better; but the prisoner clearly suffered no injury by the giving of it as modified. The law on the subject was laid down in *Jones's Case,* 20 W. Va. 764. To suit this case we here again affirm the principle: Upon a trial for murder the use of a deadly weapon being proved, and the prisoner relying upon self-defence, to excuse him for the use of the weapon the burden of showing such excuse is on the prisoner, and to avail him he must prove such defense by a preponderance of the evidence. The court did not err to the prejudice of the prisoner by modifying said instruction and giving it as modified.

The eleventh bill of exceptions is to the refusal of the court to set aside the verdict and grant the prisoner a new trial on affidavits filed showing that J. M. Scarberry was an incompetent juror. It appears, that said Scarberry was sworn on his *voir dire* and declared that he had not formed or expressed any opinion as to the guilt or innocence of the accused, was not therefore challenged and was sworn as a juror. The prisoner in his affidavit says he was ignorant until after the trial had ended of the expressions of opinion referred to in the affidavits of three persons filed in the case, and had done all in his power to ascertain, whether any of the jurors sworn in his case had expressed any opinion as to his guilt. The affidavit of T. C. Stewart shows, that nearly two months before the trial, many the time and place, he heard the said J. M. Scarberry "express the opinion that the said James A. Greer ought to be hung for the murder of said Robert Maguire." G. W. Pringle, in his affidavit says he was present at the time and place mentioned by T. C. Stewart and heard said Scarberry express the opinion substantially as stated by said Stewart. J. B. Coats in his affidavit says, that "during the past summer he heard said Scarberry at the house of Mrs. Brown express the opinion that James A. Greer ought to be severely punished for killing said Robert Maguire." Lafayette Ringhstep in his affidavit says, that "about two months

before the trial in a conversation held in the town of Ripley he heard said Scarberry say, that James A. Greer ought to be sent to the penitentiary for killing Robert Maguire." The affidavits were not, nor were either of them contradicted.

It has been held by many courts that a juror, who has formed and expressed an opinion of the guilt of the accused before trial, is disqualified, and that fact, if unknown to the prisoner or his counsel until after the verdict is rendered, is good ground for setting aside the verdict and granting a new trial. *Bennett et al.* v. *State*, 24 Wis. 57; *French* v. *Smith*, 4 Vt. 363; *Childress* v. *Ford*, 10 S. & M. 25; *State* v. *Tuller*, 34 Conn. 281; *Eastman* v. *Wright*, 4 Ohio St. 156; *Vennum* v. *Harwood*, 1 Gil. 659; *Comm.* v. *Hussey*, 13 Mass. 221; *Jeffries* v. *Randall*, 14 Mass. 205; *Hudgins* v. *State*, 61 Ga. 182; *State* v. *Babcock*, 1 Conn. 401; *Pierce* v. *Bush*, 3 Bibb 347; *Vance* v. *Haslett*, 4 Bibb. 191; *Hudspeth* v. *Herston*, 64 Ind. 133; *Romaine* v. *State*, 7 Ind. 63; *Mayor* v. *Goetchius*, 7 Ga. 139; *McKinly* v. *Smith*, Hard. (Ky.) 167; *Cain* v. *Cain*, 1 B. Mon. 313; *State* v. *Groome*, 2 Ia. 309; *State* v. *Shelledy*, 8 Ia. 477; *Cody* v. *State*, 3 How. (Miss.) 27.

In *Mitchum* v. *State*, 11 Ga. 615, it was held, that it was not good ground for a new trial, that a juryman had said before the trial: "If the evidence was as he had heard it, the prisoner was guilty and would be hung." In the opinion the court said: "This declaration indicates no settled opinion of his own, no passion or prejudice. It leaves the mind free to determine according to the evidence." To the same effect is *Jim.* v. *State*, 15 Ga. 535.

In *Hanks* v. *State*, 21 Tex. 526, the defendant pleaded guilty to an indictment for assault and battery, and a member of the jury, which assessed the fine, upon meeting with the person, upon whom the assault was committed, for which defendant was indicted, before the trial said to him, "your name is Pelham is it not? I don't know you but I am well acquainted with your case, and I will be on the jury and will do all I can for you," held to be good cause for granting a new trial, where the prejudice of the juror was unknown to the defendant until after the trial.

In *People* v. *Plummer*, 9 Cal. 298, it was held, that the declaration of a juror before trial, that "the people ought to

take prisoner out of jail and hang him," renders him incompetent to try the case; 'and where a verdict of guilty has been found by such juror the court should grant a new trial." Terry, C. J. said, speaking for the court: "A man, who could so far forget his duty as a citizen and his allegance to the Constitution, as to openly advocate taking the life of a citizen without the form of law, and deprive him of the chance of a jury, would not be likely to stop at any means to secure under the forms of a legal trial a result, which he had publicly declared ought to be accomplished by an open violation of the law."

In *Sellers* v. *The People*, 3 Scam. 412, it was held, that where a juror a short time previous to the trial of a prisoner for murder and on several occasions said he believed the prisoner "would be hung; that he ought to be hung; that nothing could save him; and that there was no law to clear him," and subsequently went to the jail, and told the prisoner that "he ought not to be hung; and if he were on the jury, he should not be hung;" but afterwards, when sworn on the trial touching his competency as a juror, he stated that he had formed and expressed no opinion; and no objection being made to him he was sworn on the jury, and the prisoner was convicted; a new trial was granted on the ground of the incompetency of the juror. The court further held, that it had always been held, that if a juror prejudge a cause, and it is unknown to the failing party in time to challenge, it is a good cause for a new trial. Judge Douglass, who pronounced the opinion of the court, said: "Can it be said that that juror was impartial? that he possessed that moral perception, that sense of justice, that integrity of character, which would qualify him to pass upon the life of a fellow-citizen? It presents the revolting spectacle of deep-seated malice concealed under the sacred garb of friendship, destroying its victim by adding treachery to perjury. It is wholly immaterial for the purposes of this motion, whether the prisoner be guilty or innocent, law, justice, humanity, forbid that he should be deprived of his life by such means and by a jury thus constituted."

In *Commonwealth* v. *Flanagan*, 7 Watts & S. 415, it was held, that "the expression of an opinion by a juror with re-

gard to the guilt or innocence of a defendant, before he, the juror, is called to the box, is a good cause of challenge; but after trial it is not a sufficient cause for granting a new trial. If the juror had prejudged the case, having his mind unopen to conviction, it would be a good cause to set the verdict aside." Roger, Judge, in delivering the opinion of the court, said: "It has been ruled, as already stated, that where a juror has expressed an opinion on the case, it is good cause of challenge, a challenge to the favour; but from this it by no means follows, that the same rule must be applied on a motion for a new trial. Thus in the case of *McCausland* v. *McCausland*, 1 Yeates 378, this distinction is taken, the good sense of which is its best recommendation. Prejudging and giving an opinion (as is there said, on a statement of certain facts are very different things. The first implies a strong disposition to favor the one side or the other, a determination to find in one way, let the evidence be what it may. The last involves the truth of certain facts and propositions in the sentiments delivered; and impressions thus made may be effaced by the production of other evidence. The first involves a charge of gross misbehavior, amounting to criminality, on the part of a juror, who consents to serve on a jury, when he must know he has precluded himself from forming a just judgment by a prejudication of the case, a determination to decide right or wrong in a particular way. The second that which is natural to the human mind, to form, and even to express an opinion on a supposed state of facts, an opinion only binding or influencing them, provided the case should turn out, as it has been represented. While the first, to the credit of human nature be it spoken, is rare, and cannot be believed without full and unexceptionable proof, the latter is of daily and common occurrence. One is immoral, the other may be excused; for experience teaches every man, that few persons can keep their minds unbiased upon hearing a strong one-sided statement; and particularly where the welfare and safety of society are at stake, as where an enormous crime has been committed. Now the impression, which has been made on my mind from an attentive consideration of all the evidence, which it is unnecessary for me to give in detail, is,

that it amounts to nothing more than the expression of an opinion on a given state of facts, to that abhorrence of crime which is excusable, if not commendable, immediately after the commission of a great outrage against the peace and welfare of the community, of which the jurors were members. That it was of such a nature, that it might and would have been effaced, provided the facts proved had been different from what was represented, there is not the least reason to doubt." See also *State* v. *Scott*, 1 Hawks 24; *Howerton* v. *State*, 19 Tenn. (10 Meigs) 262; *Troxdale* v. *State*, 9 Humph. 411.

In Virginia and this State it has been repeatedly held, that a new trial will not be granted in a criminal case for matter that is a principal cause of challenge to a juror, which existed before he was elected and sworn as such juror, but which was unknown to the prisoner until after the verdict, and which could not have been discovered before the juror was so sworn by the exercise of ordinary diligence; unless it appears that the prisoner suffered injustice from the fact that such juror served upon the case. *Smith's Case*, 2 Va. cases 6; *Poore's Case, Id.* 474; *Kennedy's Case, Id.* 510; *Brown's Case, Id.* 516; *Hughes's Case*, 5 Ran.; *Jones's Case*, 1 Leigh 598; *Heath's Case*, 1 Rob. R. 735; *Hailstock's Case,* 2 Gratt.; *Curran's Case,* 7 Gratt. 619; *Deburth's Case*, 12 Gratt.; *Bristow's Case*, 15 Gratt. 634; *McDonald's Case*, 9 W. Va. 456. The same doctrine is held in civil cases. *Sweeny* v. *Baker*, 13 W. Va.; *Flesher* v. *Hale*, 22 W. Va.

What is meant by the following language used by the courts in Virginia and in this State: "Unless it appears that the prisoner suffered injustice from the fact that such juror served upon the case?" It certainly cannot mean, that in order to ascertain whether the prisoner has suffered injustice, the court is to look into the evidence against the prisoner on the issue tried in the case, because it would be impossible to ascertain, in that way, whether he had suffered injustice. The plain meaning of the language is, that the trial-court upon a motion for a new trial on such ground will look into the affidavits or other evidence offered to sustain the motion, and from them determine, whether the juror, who had before the trial expressed his opinion as to the

guilt of the accused, had merely expressed such opinion from
a partial knowledge of the case, and whose mind was un-
biased so that he could impartially try the accused upon the
charge, or whether he had prejudged the case and was de-
termined to find him guilty without regard to evidence;
and if from such affidavits or other evidence it appeared on
the motion for a new trial, that a juror had prejudged the
case and had not merely expressed an opinion, which might
be changed by evidence, it would be assumed that the pris-
oner was injured, and it would be the duty of the court to set
aside the verdict and grant a new trial for that cause. And
if a motion in such a case were overruled, the appellate
court would on writ of error for that cause reverse the judg-
ment and set aside the verdict and grant a new trial. If it
appeared from the affidavits and other evidence to the satis-
faction of the court, that the expressions of opinion were such
that the juror might readily have forgotten, then the court
would regard it as a mere opinion and not a prejudgment,
and that, when the juror on his *voir dire* declared he had ex-
pressed no opinion as to the guilt or innocence of the accused,
he did not swear falsely, but had forgotten that he had ex-
pressed such opinion; but if on the other hand it appeared,
that decided opinions had been expressed by him as to the
guilt of the accused so recently and so decidedly, as to con-
vince the court, that for the purpose of being a member of
the jury he denied on oath, that he had expressed any
opinion as to the guilt of the accused, then it is clear, that
he had prejudged the case; and of course the prisoner was
injured by his being on the jury. I do not think, however,
that the affidavits in this case, uncontradicted as they are,
show that the juror, Scarberry, had prejudged the case, but
only that he had expressed an opinion formed upon what he
had heard, which opinion might yield to the evidence in the
case. The court did not err, therefore, in refusing to set
aside the verdict on this ground.

The *twelfth* bill of exceptions is to the refusal of the court
to set aside the verdict and grant a new trial, because spirit-
uous liquors were at the request of some of the jury furnished
to the jury and drunk by them while deliberating on their
verdict.

Perry Stone, one of the deputy sheriffs in charge of the jury, in his affidavit says: "A day or two after the jury were empaneled, some of them complained of being costive and requested Depue, another deputy sheriff sworn to have the jury in charge, to go and get some whisky and put some rhubarb in it, and on request of the jurymen, Park, Morgan and Chancy, said Depue procured three half pint bottles of whisky and brought it to the jury, and it was drunk by most of the jury with the rhubarb in it. * * * And witness, about one week before the jury rendered their verdict, procured and took to them at their request three bottles of beer, each bottle holding about one quart, and this was drunk by the jury, and the said rhubarb and whisky were placed in a cupboard, where all could use it at will; and witness saw none of the jurors under the influence of whisky, and none were affected by whisky, but each one who desired to do so took small drinks of the whisky and rhubarb."

Deputy Sheriff J. W. Depue, in his affidavit says : "Witness bought some whisky and rhubarb for the jury empaneled in said cause; that witness put the rhubarb in two half pint bottles to take to the jury, and witness endeavored to, and thinks he did, put sufficient rhubarb in said whisky, that two spoonfuls of the mixture would produce an operation on those drinking the mixture, and that witness took two other half pint bottles of whisky to the jury, into one of which no rhubarb was put; and that the whisky was taken to the jury after adjournment hours; that one of said bottles of whisky was given to one of the jury on the morning of the day, on which the jury rendered its verdict, about two and a half or three hours before court sat; and that witness observed the jury very closely, and not any of the jury became intoxicated from the use of said whisky. * * * The verdict of the jury was rendered 12:30 o'clock that day."

Should the verdict have been set aside and a new trial granted? A number of courts have held in the broadest terms, that the use of intoxicating liquor by a jury while deliberating on the case will vitiate the verdict. *People* v. *Douglass*, 4 Cow. 26; *Bryant* v. *Fowler*, 7 Cow. 562; *Kellogg* v. *Wilder*, 15 Johns. 455; *Rose* v. *Smith*, 4 Cow. 17; *State* v. *Baldy*, 17 Ia. 39; *Gregg* v. *McDavid*, 4 Harr. 367; *Ryan* v. *Harrow*,

28 Ia. 494; *Stone* v. *State*, 4 Humph. 27; *State* v. *Bullard*, 16 N. H. 139; *People* v. *Ransom*, 7 Wend. 417; *Leighton* v. *Sargent*, 31 N. H. 117.

In *State* v. *Bullard*, 16 N. H., the court by Woods J. said: "We are of opinion that the use of stimulating liquor by a jury deliberating upon a verdict in a criminal case without first showing a case requiring such use, and procuring leave of the court for that purpose, is a sufficient cause for setting aside a verdict found against the prisoner under such circumstances whether the use was an intemperate one or otherwise."

In *Leighton* v. *Sargent*, 31 N. H., Woods C. J. who pronounced the opinion of the court said: "For the cause that brandy was furnished to the jury and drank by several of them while deliberating on the case after retiring to form their verdict, we think the verdict should be set aside. The quantity drank was probably small, but we cannot consent that, that fact should make a difference. We fully concur in the remark made by the learned judge in *People* v. *Douglass*, 4 Cow. 36. 'It will not do to weigh and examine the quantity which may have been taken by the jury, nor the effect produced.' The cause alleged of slight illness will not justify the use made of the liquor. The case was not so pressing as not to allow of opportunity for leave to be given for its use if found to be one properly requiring it."

Many decisions hold, that the mere fact, that intoxicating liquors were used by the jury while deliberating on the case, is not sufficient to set aside the verdict, if it appears that no injury resulted therefrom. *Wilson* v. *Abrahams*, 1 Hill 207; *Preston* v. *Humphries*, 6 Greenl. 379; *United States* v. *Gilbert*, 2 Sumn. 21; *Pelham* v. *Page*, 1 Eng. 535; *Davis* v. *The People*, 19 Ill. 74; *Westmorland* v. *State*, 45 Ga. 225; *State* v. *Upton*, 20 Mo. 397; *Pope and Jacobs* v. *State*, 36 Miss. 121; *Russell* v. *State*, 53 Miss. 367; *Green* v. *State*, 59 Miss. 501; *Roman* v. *State*, 41 Wis. 312; *Richardson* v. *Jones & Denton*, 1 Nev. 405; *Thompson's Case*, 8 Gratt.

In the case in 36 Miss. *supra*, Smith, C. J., speaking for the court, said: "Drinking in any shape is not to be tolerated in a jury during the progress of a trial. The conduct and acts of the jury as well as those of the bailiff were there-

fore highly reprchensible. But the true point of enquiry here, is not whether these parties were guilty of improper and illegal conduct, but whether by such conduct the verdict was improperly influenced. If indeed the evidence closed with the naked fact, that ardent spirits in quantities sufficient to produce intoxication were conveyed by the officer into the jury-room, we should feel no hesitation, in holding that the conviction should be set aside. Upon such proof there would be ground for suspecting the purity of the verdict. And where facts are established which show that improper influences might have been brought to bear upon the jury, and there is no opposing testimony which negatives the presumption thus created, according to the settled rule of this court the verdict will be deemed vicious."

In *Russell* v. *State*, 63 Miss. *supra*, it was held, that while the introduction of intoxicating liquors as a beverage into the jury-room is highly censurable and should be the subject of exemplary punishment, it will not vitiate the verdict, if it can be affirmatively shown not to have injuriously affected the deliberations of the jury. In this case a pint and a half of whisky was taken into the jury-room four days before the verdict was rendered, and another pint and a half three days before. The verdict was sustained. In that case the judge who pronounced the opinion said: "If the judge of the court below failed to punish the bailiff who furnished these jurors with liquor he failed to discharge his duty. After the repeated decisions on this subject, it is certainly time, that both jurors and officers were informed as to the law in this respect; and if they will learn it in no other manner, it is the duty of the circuit judges to teach them by fines and imprisonments."

This Court held in *Curtright's Case*, 20 W. Va. 32, and same in *Robinson's Case*, *Id.* 713, that where there has been an improper separation or misbehavior of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption, that the irregularity has been prejudicial to him, and the burden of proof is on the prosecution to show beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation or misbehavior. If the prosecution fails to do this, the verdict

should be set aside. The authorities generally agree, that drinking intoxicating liquors in the jury-room as a beverage, while the jury is deliberating on their verdict, is gross misbehavior. It is a gross breach of trust and duty for the officer having charge of the jury to furnish them liquors. This misconduct of the jury raises the presumption, that the prisoner was injured thereby, which the State must remove beyond a reasonable doubt; and when jurors so far forget themselves as to secretly send for liquor, and the officers are forgetful enough of their sworn duty to furnish it for them, the presumption from this gross misconduct is such, that the burden is thrown upon the State to show beyond a reasonable doubt, that no injury resulted to the prisoner therefrom.

Has it been clearly shown by the affidavits that no injury resulted to the prisoner? I think not. The officers who furnished the whisky in violation of their solemn duty, are the only persons, who say the jury nor any of them were affected by the quart of whisky and three quarts of beer. Their statement as to the quantity used, or when used is entitled to very little weight. It is admitted by one of the officers, that he gave one of the jurors a half pint of whisky a few hours before the verdict was rendered. Who drank it does not appear. It was certainly sufficient to make the man drunk, who received it. Again, it seems to us, that the mixing of the rhubarb in the greater quantity of liquor was a sham, upon which to frame an excuse, if the fact, that the jury drunk liquor during their deliberations, was found out. It shows, that they were conscious of doing wrong. If the guilty officers and jurors were not punished for this glaring offence, the judge of the circuit court did not do his duty. Under the circumstances shown in this case we think, that the verdict should have been set aside because of the misconduct of the jury in drinking liquor during their deliberations.

The last error assigned is, that the jury ascertained the term of imprisonment by their verdict. This was irregular, and the court should have informed them, that it was no part of their duty to fix the term of imprisonment and should have sent them back to their room to correct it. But it was surplusage and did not vitiate the verdict. The court fixed

the term, as the judgment shows; and because he fixed the same term found by the jury, is immaterial. Jurors may be influenced by courts; but we cannot presume that courts will be influenced in the discharge of their duties by jurors. *Harvey* v. *Comm.*, 23 Gratt. 941.

For the foregoing reasons the judgment of the circuit court is reversed, the verdict set aside, and the case remanded with instructions to the court below to enter an order removing, if again asked, said case to some other county for a new trial there to be had.

THE OTHER JUDGES CONCURRED.

REVERSED.    REMANDED.